**In re OUR SECRET, LTD., Debtor.**

No. 11–01–18004 MA.

United States Bankruptcy Court,
D. New Mexico.

Aug. 28, 2002.

John E. Farrow, Albuquerque, NM, for Wells Fargo Equipment Finance.

William F. Davis, Albuquerque, NM, for Our Secret.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARK B. MCFEELEY, Chief Judge.

THIS MATTER came before the Court on Wells Fargo Equipment Finance, Inc.'s Motion for Relief from Stay ("Motion"). At issue are three agreements entered into between Norwest Equipment Finance, Inc. ("Norwest") and Our Secret, Ltd. ("Our Secret"). Later, these agreements were assigned to Wells Fargo Equipment Finance, Inc. ("Wells Fargo"). Wells Fargo contends that these agreements are true leases and it asks this court to grant Relief from Stay so that it may proceed on its rights as lessor. In opposition, Our Secret argues that the agreements are disguised security agreements. After conducting a hearing on the merits and considering the evidence and arguments of counsel, the Court makes the following findings of facts and conclusions of law:

## FINDINGS OF FACT

1. On December 22, 1997, Our Secret entered into an agreement with Norwest. The agreement is entitled Master Lease and assigned number 31005 ("Master Lease"). The Master Lease designates Norwest as Lessor and Our Secret as Lessee.

2. The Master Lease provides that Norwest will provide personal property to Our Secret. All personal property subject to the provisions of the Master Lease will be described in attached Supplements. Each resulting lease is to include both the provisions in the Master Lease and the provisions in the respective Supplement "the same as if a single lease agreement containing such terms had been executed covering such items."

3. Pursuant to the terms of the Master Lease, Our Secret is required to perform all maintenance and repair on the equipment, insure the equipment, and pay all taxes on the equipment.

4. The Master Lease does not provide for termination during the initial term of the lease although it provides for termination or automatic extension after the initial term. The provision granting the right to terminate or to extend appears in the second paragraph of paragraph two (hereinafter "section 2.2") as follows:

Automatic Extension: Lessee or Lessor may terminate this lease at the expiration of the initial term by giving the other at least 90 days prior written notice of termination. If neither Lessee nor Lessor gives such notice, then the term of this lease shall be extended automatically on the same rental and other terms set forth herein (except that in any event rent during any extended term shall be payable in the amounts and at the times provided in paragraph 3) for successive periods of one month until terminated by either Lessee or Lessor giving the other at least 90 days prior written notice of termination.

5. If the lease is extended under section 2.2, the second paragraph of Paragraph 3 of the Master Lease (hereinafter, "section 3.2") provides the following payment terms:

During any extended term of this lease, basic rent shall be payable monthly in advance on the first day of each month during such extended term in the amount equal to the basic rental payment set forth in the related Supplement if rent is payable monthly during the initial term or in an amount equal to the monthly equivalent of the basic rental payment set forth in the related Supplement if rent is payable other than monthly during the initial term. In addition, Lessee shall pay any applicable sales and use tax on rent payable during any extended term.

6. The Master Lease provides that if Our Secret defaults, its loss may be tallied as the sum of the following:

(1) the amount of all rent and other amounts payable by Lessee hereunder due but unpaid as of such date plus (2) the amount of all unpaid rent for the balance of the term of this lease not yet due as of such date discounted from the respective dates installment payments would be due at the rate of 5% per annum plus (3) 10% of the cost of the Equipment subject to this lease as of such date.

7. Attached to the Master Lease are three Supplements: Supplement Number 31005–100 dated December 22, 1997 (hereinafter, "Supplement A" when referred to alone, "Agreement A" when referring to the agreement's terms through both the provisions in Supplement A and the Master Lease); Supplement Number 31005–101 dated July 21, 1998 (hereinafter, "Sup-

plement B" when referred to alone, or "Agreement B" when referring to the agreement's terms through both the provisions in Supplement B and the Master Lease); and Supplement Number 31005–400 dated November 17, 1999 ("Supplement C").

8. Each Supplement describes personal property used by Our Secret and is governed by the terms provided in the respective Supplement together with the terms in the Master Lease. Agreements A and B describe equipment used for making candles as well as some construction supplies.

9. At trial, this Court orally ruled that Supplement C was not a lease but a security agreement.

10. Supplement A provides the following Summary of Payment Terms:

| Initial Term in Months: | 60 | Total Cost: | $345,108.29 |
|---|---|---|---|
| Payment Frequency: | Monthly | Total Basic Rent: | $350,577.60 |
| Basic Rental Payment: | $5,842.96 plus applicable sales and use tax | Interim Rent Daily Rate: | .056 |
| Number of Installments: | 60 | Interim Rent Cutoff Date: | 12/31/97 |
| Advance Payments: | First and last due on signing the lease | Security Deposit: | N/A |

11. Supplement A provides Two End of Term Options to Our Secret as the Lessee. The first option permits Our Secret to purchase the property described in the Supplement for 15% of the total cost or the Fair Market Value of the equipment, whichever is greater. The second option provides that if Our Secret does not purchase the property described in the Supplement, it is bound to renew the lease for a period of twelve months at a monthly rate of $8,176.00 ("Option 2 of Supplement A"). At the conclusion of the 12–month term Our Secret is required to return the equipment in accordance with the lease.

12. The cost to Our Secret if it purchases the equipment at the end of the initial term under the terms of Agreement A is either $51,778.35, which is 15% of the total cost of the equipment or, if greater, the fair market value.

13. The cost to Our Secret pursuant to Agreement A if it elects not to purchase the equipment and is so required to renew the lease for a 12–month term is $98,112.00. This sum is approximately 35% of the total cost of the equipment and is approximately $46,333.65 higher than the cost to Our Secret if it purchased the equipment, assuming the price is 15% of the total cost of the equipment.

14. Neither party presented any evidence that the value of the equipment listed on Supplement A will be more than 15% of the equipment's total cost at the end of the initial term.

15. Paragraph 6 of Supplement A deletes section 2.2 relating to automatic extension and section 3.2 relating to extended terms.

16. Supplement B describes the following payment terms:

| Initial Term in Months: | 53 | Total Cost: | $39,334.52 |
|---|---|---|---|
| Payment Frequency: | Monthly | Total Basic Rent: | $42,725.95 |
| Basic Rental Payment: | $806.15 plus applicable sales and use tax | Interim Rent Daily Rate: | N/A |
| Number of Installments: | 53 | Interim Rent Cutoff Date: | N/A |

| Advance Payments: | First and Last 1 due on signing this Lease | Security Deposit: | N/A |
|---|---|---|---|

17. Supplement B provides Two End of Term Options to Our Secret as the Lessee. The first option permits Our Secret to purchase the property for 15% of the total cost or the Fair Market Value of the equipment, whichever is greater. The second option provides that if Our Secret does not purchase the equipment it is bound to renew the lease for a period of twelve months at a monthly rate of $526.42 ("Option 2 of Supplement B"). At the conclusion of the 12–month term Our Secret is required to return the equipment in accordance with the lease.

18. The cost to Our Secret pursuant to Agreement B if it purchases the equipment at the end of the initial term is $5,900.18, which is 15% of the total cost of the equipment or, if greater, the fair market value of the equipment at the end of the initial term.

19. The cost to Our Secret pursuant to Agreement B if it elects not to purchase the equipment and is so required to renew the lease for a 12–month term is $6,317.04. This sum is approximately $418.86 higher in cost to Our Secret than if it purchased the equipment, assuming the price is 15% of the total cost of the equipment.

20. Neither party presented evidence that the value of the equipment listed on Supplement B will be more than 15% of the total cost of the equipment at the end of the initial term.

21. Supplement B does not explicitly revoke section 2.2 or section 3.2.

22. On January 22, 1998, Norwest filed a financing statement in New Mexico regarding the property listed in Supplement A.

23. On August 11, 1998 Norwest filed a financing statement in New Mexico regarding the property listed in Supplement B.

24. Pursuant to Agreement A and Agreement B, Our Secret is obligated to Wells Fargo for monthly lease payments totaling approximately $6,649.11.

25. Our Secret filed a Chapter 11 petition on November 30, 2001.

26. Agreement A and Agreement B have been in default since November 30, 2001.

### CONCLUSIONS OF LAW

A creditor may move for relief from the stay under the following circumstances:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

. . . .

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2). Before a creditor will be granted relief from the stay under § 362(d)(2), both prongs of this test must be met: there must be no equity in the property and the property must be unnecessary to an effective reorganization. A debtor does not have "equity" in property if the debts secured by liens on the property exceed its value. *See, e.g., Sutton v. Bank One, Texas, Nat'l Ass'n,* 904 F.2d 327, 329 (5th Cir.1990). Section 362(g) provides that the party requesting relief

from the stay has the burden of proof on the issue of the debtor's equity; the burden of proof on all other issues is on the party opposing such relief. 11 U.S.C. § 362(g)(1), (2).

The first prong asks if the debtor has any equity in the property. Here, the property at issue is that property described in Agreements A and B. Before the above question may be answered, it must first be determined whether Agreement A and Agreement B are leases or security agreements. If the agreements are leases, then the debtor's only interest will be in its leasehold estate; it will have no equity in the property and must either assume or reject the leases under 11 U.S.C. § 365. If the agreements are security agreements, the Debtor may have equity in the property.

■ The bankruptcy code defines a security agreement as an "agreement that creates or provides for a security interest. 11 U.S.C. § 101(50)." It further defines a security interest as "a lien created by agreement." 11 U.S.C. § 101(51). Although lease is not defined by the Bankruptcy Code, the legislative history to the above sections states that "whether a consignment or a lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable State or local law." *See also Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (finding "[p]roperty interests are created and defined by state law."); *Powers v. Royce, Inc. (In re Royce),* 983 F.2d 88, 90 (7th Cir.1993) (finding "the existence, nature and extent of a security interest in property is governed by state law."). Both parties have made their arguments under New Mexico law.

■ The Uniform Commercial Code ("UCC"), as adopted in New Mexico, defines a lease as "a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, ... or retention or creation of a security interest is not a lease...." NMSA 1978 § 55–2A–103(j) (Cum.Supp.2001). A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." NMSA 1978 § 55–1–201(37) (Cum.Supp. 2001). Whether a transaction is a lease or a security agreement is "determined by the facts of each case." *Id.* The statute then qualifies this directive as signaled by the word "however," and sets out a two-part objective test that delineates factors which, if present, establish that an agreement is a security agreement no matter what the parties call it. NMSA 1978 § 55–1–201(37) (Cum.Supp.); *see, also, PSINet, Inc. v. Cisco Sys. Capital Corp. (In re PSINet),* 271 B.R. 1, 43 (Bankr.S.D.N.Y. 2001) (finding that UCC § 201(37) implements an objective test "by setting out a bright line test whereby, as a matter of law, a transaction creates a security interest."). In contrast to the previous UCC security agreement test, which focused on the respective parties' intent, the focus of the new objective test is on the agreement's economic realities (hereinafter, the objective test will be referred to as the "economic realities test"). *See, e.g., Id.; Hanes v. Vital Prod. Co. (In re Vital Prod. Co.),* 210 B.R. 109, 112 (Bankr.N.D.Ohio 1997).

■ The first prong of the economic realities test asks whether the agreement is terminable by the lessee during the term of the lease.[1] Courts have called this

1. The statute provides:
   Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to

the "hell or high water" clause because a lessee is bound to make rental payments "come hell or high water." *Colorado Interstate Corp. v. CIT Group/Equipment Fin., Inc.*, 993 F.2d 743, 745 (10th Cir. 1993). If the agreement is not terminable by the lessee during the lease term, then the first factor of the test has been established.

▪▪▪ Here, the Master Lease provides a termination clause that may be implemented only at the end of the initial lease term. However, both Agreement A and Agreement B revoke that clause and so meet the first prong of the economic realities test.

Supplement A explicitly revokes the termination clause of the Master Lease and does not grant any replacement termination powers. As a result, under Agreement A, Our Secret must either purchase the goods, agree to renew for an additional twelve-month period, or default on the lease.

While Supplement B does not explicitly revoke the termination clause of the Master Lease, it does so implicitly. Section 2.2 of the Master Lease grants the power to terminate only on the end of the initial term. However, Supplement B, in language identical to Supplement A, provides that Our Secret shall purchase the goods or renew the lease for a twelve-month

period. The word "shall" is mandatory. Uniform Statute and Rule Construction Act, *NMSA 1978 § 12–2A–4* (Cum.Supp. 2001); *see also Gandy v. Wal–Mart Stores, Inc.*, 117 N.M. 441, 872 P.2d 859, 860 (N.M.1994) (interpreting rule). Therefore, the option to terminate is superceded by the terms of Supplement B.

The second part of the economic realities test focuses on whether the agreement meets one of the following four factors:

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

NMSA 1978 § 55–1–201(37) (Cum.Supp. 2001). The statute further establishes the parameters of these four factors by identifying four factors that do not automatically signal a security agreement[2] and by defin-

---

possession and use of the goods in an obligation for the term of the lease not subject to termination by the lessee. . . .
NMSA 1978 § 55–1–201(37).

**2.** A transaction does not create a security interest merely because it provides that:

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance,

filing, recording or registration fees or service or maintenance costs with respect to the goods;

(c) the lessee has an option to renew the lease or to become the owner of the goods;

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably pre-

ing the following pivotal terms: nominal, reasonably predictable and present value. NMSA 1978 § 55–1–201(37). For the purpose of this case, only the definition of the term "nominal" is relevant. The statute defines nominal consideration as follows:

> (x) additional consideration is not nominal if: (i) when the option to renew the lease is granted to the lessee, the rent is stated to be the fair market value rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or (ii) when the option to become the owner of the goods is granted to the lessee, the price stated to be the fair market value for the goods determined at the time the option is to be performed. *Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised....*

NMSA 1978 § 55–1–201(37)(x) (emphasis added). Ultimately, if an agreement meets the "hell or high water test" and one of the above listed factors, then the two-part economic realities test is satisfied and the agreement is not a lease but a security agreement.

Here, under both Agreement A, and Agreement B, Our Secret must either renew the lease or extend the lease for twelve months. Under either agreement, the cost to renew the lease is greater than if Our Secret decided to purchase the property. If the cost to renew the lease is greater than the cost to buy the equipment, then, by definition, the latter sum is nominal consideration. Because Our Secret may become the owner of the goods for nominal consideration at the end of the lease terms in both Agreement A and Agreement B, factor (d) of the second

prong of the test is met as to both agreements. Both parts of the economic realities test are satisfied. Agreements A and B are security agreements and not leases.

Because the agreements are security agreements, it is Wells Fargo burden to show that Our Secret had no equity in the property at issue. Well Fargo introduced no evidence to this effect. Nor was any evidence of continuing depreciation of the value of the equipment presented that would justify an award of adequate protection. Therefore, Well Fargo's Motion for Relief from Stay is denied.

### CONCLUSION

For the foregoing reasons, the Court denies Wells Fargo's Motion to lift the stay. This opinion constitutes the Court's findings of facts and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. An appropriate order will be entered.

---

dictable fair market value of the goods at the time the option is be performed.

NMSA 1978 § 55–1–201 (Cum.Supp.2001).