In re GRUBBS CONSTRUCTION
COMPANY, Debtor.

No. 03–08573–8W1.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Jan. 7, 2005.

David S. Jennis, Chad S. Bowen, Adam C. King, Jennis & Bowen, P.L., Tampa, FL, for Debtor.

Steven M. Berman, Berman and Norton Breman, a Professional Association, Tampa, FL, for SouthTrust Bank.

Kenneth G.M. Mather, Hinshaw & Culbertson, Tampa, FL, for Banc One Leasing Corporation.

### Memorandum Decision on Characterization of Banc One Leasing Corporation's Equipment Leases

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

The issue before the Court is whether the equipment leases between the Debtor, Grubbs Construction, Inc. ("Grubbs"), and Banc One Leasing Corporation ("Banc One") are to be characterized as true leases or as secured transactions. This issue has been the subject of many court decisions, the common thread of which has been to conduct a fact-intensive analysis to determine the "economic realities" of the transactions. Applying that test to the leases between Grubbs and Banc One, the Court finds that under the facts of this case, it is clear that the economic realities of the lease transactions between the parties compel a finding that they must be interpreted and enforced as security agreements subject to Article 9 of the Uniform Commercial Code. This memorandum discusses the basis for this determination.

### Findings of Facts

A. *General Terms under Master Lease Agreement.*

On November 9, 1998, Grubbs and Banc One entered into a Master Lease Agreement containing the general provisions governing individual equipment purchase transactions under which Grubbs financed the purchase of equipment from third-party vendors in five transactions occurring from November 1998 until September 1999. Master Lease Agreement, Ex. # 1. The Master Lease Agreement does not contain the actual financial terms or identify the individual items of equipment ("Equipment"). Rather, it simply describes the general terms of the parties' relationship. The terms of the specific equipment lease transactions are incorporated by reference in individual schedules ("Lease Schedules") executed as part of each of the later equipment purchase transactions.

Under the terms of the Master Lease Agreement, Grubbs is unconditionally liable for all rent payments, without regard to whether the Equipment is defective. Grubbs bears the risk of any loss and is obligated to insure the Equipment. Grubbs is also responsible for all problems

relating to the delivery to Grubbs of the Equipment from the third-party vendors as well as all repairs and maintenance to the Equipment. Master Lease Agreement, para. 4, Ex. # 1.

The Master Lease Agreement contains a "Tax Benefits Indemnity" provision under which Banc One's entitlement to certain "Tax Benefits" is guaranteed. This indemnity provision requires Grubbs to be responsible for any change to federal tax law resulting in a reduction of the benefits anticipated by Banc One at the commencement of the Lease Schedule. Master Lease Agreement, para. 10(a), (b), Ex. # 1. The Master Lease Agreement also contains a general indemnity clause under which Grubbs is liable to Banc One for any losses to which Banc One may be exposed "of whatsoever kind and nature" relating to Banc One's "ownership" of the Equipment. Master Lease Agreement, para. 12, Ex. # 1.

B. *Repayment Terms of Amounts Financed.*

1. *Repayment Obligation Absent Default.*

Under the terms of the Master Lease Agreement, it initially appears that at the end of the terms of the individual Leases, Grubbs can elect to either return the Equipment or purchase the Equipment by paying an amount equal to the fair market value of the Equipment. Master Lease Agreement, para. 23(a) and 23(d), Ex. # 1.

However, the terms of the Master Lease Agreement are superseded by the specific Lease Schedules relating to each Equipment purchase. Four of the five Lease Schedules contain "Early Buyout Option Addendums" ("Early Buyout Options" or "EBOs") and "Renew–or–Purchase Addendums" ("Renew–or–Purchase Addendums"). These four Lease Schedules have as their last five numbers: 90799, 93096, 95960, and 95960, and will be referred to as the "EBO Leases." Exs. # 2, 4, 8, and 10. A fifth Lease Schedule, with the last five numbers of 92935, does not have an Early Buyout Option or Renew–or–Purchase Addendum. Instead, it contains a terminal rental adjustment clause ("TRAC") and will be referred to as the "TRAC Lease." Ex. # 6. (Collectively, the "EBO Leases" and the "TRAC Lease," shall be referred to as the "Leases.")

a. *The EBO Leases.*

With respect to the four EBO Leases, Grubbs is provided three alternatives at the end of the Lease terms. Using Lease No. 93096 as an example,[1] these alternatives are:

(1) *Alternative # 1: Exercise Early Buyout Option (66th Month).*

Prior to the expiration of the original lease term as set forth in the individual Lease Schedules, Grubbs may elect to terminate the Lease and purchase the Equipment by paying Banc One the "Early Buyout Value" as defined in the particular Early Buyout Option Addendum. By way of example, Lease No. 93096 has a term of 72 months. Under the Early Buyout Op-

---

1. All of the EBO Leases are substantially similar, except to the limited extent that Lease No. 90799 (Ex. # 8) has a substantially longer initial term of 96 months as compared to 60–72 months for the other EBO Leases and does not require Grubbs to renew the Lease or purchase the Equipment at the end of the initial 96–month period of the Lease. However, similar to the other EBO Leases, Lease

No. 90799 does contain an Early Buyout Option, an option to renew or purchase at the end of the initial lease term, and a Return/Maintenance Addendum. Based on the presence of these provisions in all of the EBO Leases, the findings of fact that are illustrated herein by reference to Lease No. 93096 apply to all of the EBO Leases.

tion Addendum, Grubbs may satisfy its obligations under Lease No. 93096 and acquire ownership of the associated Equipment by paying to Banc One on the "Buyout Date" of the "66 month of Lease Term" the "Early Buyout Value." The Early Buyout Value is determined by multiplying the "EBO Percentage" of 31 percent, as specified in the Early Buyout Option Addendum for Lease No. 93096, times the original cost of the Equipment. The effect of Grubbs' exercising the Early Buyout Option with respect to Lease No. 93096 is that Grubbs will acquire at the end of month 66, ownership of equipment with an initial cost of $525,000 for a total of $637,687.32—representing 66 months of payments in the amount of $7,187.27 plus the Early Buyout Option payment of $163,327.50 (31 percent of the original cost of $525,000).

The key factor considered by Grubbs' chief financial officer in his decision to finance the Equipment with Banc One (as opposed to the numerous other finance companies considered), was the effective interest rate charged by Banc One for its financing under the Early Buyout Option Addendum. The effective interest rates for the Banc One Leases ranged from 5.52 percent to 7.15 percent. With respect to Lease No. 93096, the effective interest rate under the Early Buyout Option is 5.86 percent. Exs. # 12 & 13.

*(2) Alternative # 2: Purchase at Expiration Date (72nd Month).*

If Grubbs does not exercise the Early Buyout Option at the end of month 66, its alternatives are limited to those described in the Renew–or–Purchase Addendums.[2] By way of example, Lease No. 93096 provides that Grubbs "*shall,*"[3] at the end of the Lease Term of 72 months, either purchase the Equipment or renew the Lease under terms set forth in the Renew–or–Purchase Addendum for Lease No. 93096. Renew–or–Purchase Addendum, paras. 2 and 3, Ex. # 2.

The purchase option price under the Renew–or–Purchase Addendum is the "*greater*"[4] of the Fair Market Value (as defined in Master Lease section 23(d) . . .) of the Equipment and the Minimum Value set forth below." Renew–or–Purchase Addendum, para. 2, Ex. # 2. Each of the Renew–or–Purchase Addendums contains a "Minimum Value" ranging from 15–28 percent of the "Lessor's Cost of the Equipment." *Id.* In Lease No. 93096, the Minimum Value percentage is 25 percent. Accordingly, the effect of Grubbs' electing to purchase the Equipment for the "Minimum Value" under Lease No. 93096 under the Renew–or–Purchase Addendum is that Grubbs will acquire at the end of month 72 ownership of Equipment with an initial cost of $525,000 for a total of $648,733.44—representing 72 months of payments in the amount of $7,187.27 plus the Minimum Value payment of 25 percent of $525,000 or $131,250.00.

This illustration assumes, however, that the fair market value of the Equipment is either less than the Minimum Value or that Banc One does not successfully contest the valuation, and Grubbs is able to acquire ownership for the Minimum Value

---

**2.** As noted above, fn. 1, *supra,* Lease No. 90799 does not require the exercise of the renew or purchase option at the end of the 96–month initial term. Under this Lease, if Grubbs does not renew or purchase the Equipment under Alternative # 2, Grubbs may return the Equipment subject to the "Re-

turn/Maintenance Addendum" obligations discussed in the context of Alternative # 3, *infra.*

**3.** Emphasis in original.

**4.** Emphasis in original.

as opposed to a potentially higher "fair market" value. Obviously, this option compares even less favorably to the Early Buyout Option from a financial perspective if Grubbs is not able to acquire the Equipment for the Minimum Value.

### (3) Alternative # 3: Renew for Renewal Term.

The only other alternative available to Grubbs at the end of the Lease Term (if it does not elect to purchase the Equipment under the Renew–or–Purchase Addendum) is to renew the Lease term for the period set forth in the Renew–or–Purchase Addendum. By way of example, Lease No. 93096 provides in the Renew–or–Purchase Addendum a renewal term of 14 months, and renewal monthly rent of $9,572.88. Accordingly, the effect of Grubbs' not electing to purchase the Equipment under Lease No. 93096 (under either the Early Buyout Option Addendum or the Renew–or–Purchase Addendum) is that Grubbs will have to renew the Lease at the end of month 72 and make 14 additional payments for total additional payments of $134,020.32. However, at that point, although Grubbs will have paid a total of $659,020.32—the highest amount under any alternative—for equipment with an initial cost of $525,000, it will not have acquired ownership of the Equipment and must either return the Equipment or purchase it by paying an amount equal to the fair market as determined under section 23(d) of the Master Lease Agreement. If Grubbs does not purchase the Equipment under this final alternative (or, with respect to Lease No. 90799, Alternative # 2), then it must return the Equipment subject to a "Return/Maintenance Addendum," under which Grubbs would have significant obligations to refurbish the Equipment to include replacing parts that have exceeded 50 percent of their useful life—a very unattractive proposition from Grubbs' perspective financially and one which Grubbs'

financial officer did not contemplate ever occurring. "Return/Maintenance Addendum" to Lease Schedules, para. 1.(d), Exs. # 2, 4, 8, and 10.

### (4) Comparison of Grubbs' Alternatives under EBO Leases.

As set forth above, Grubbs has three alternatives under the EBO Leases. Again using Lease No. 93096 as an example, under Alternative # 1, it can pay a total of $637,687.32 over 66 months and own the Equipment at that time; under Alternative # 2, it can pay a total of $648,733.44 over 72 months and own the Equipment at that time (assuming that Banc One does not take the position that fair market value exceeds the defined Minimum Value under the Lease, in which case the price to acquire ownership would increase); or, under Alternative # 3, it can pay a total of $659,020.32, and not own the Equipment (but instead have an option to purchase the Equipment based on its fair market value to be determined at that time or return the Equipment and incur substantial additional costs to refurbish aged Equipment).

It was clear from the Debtor's perspective, as credibly testified by the Debtor's chief financial officer who considered various financing sources and negotiated the lease terms with Banc One, that from the inception Grubbs did not have any other choice from an economic perspective other than purchasing the Equipment under the Early Buyout Option Addendum. Testimony of Vic Taglia, transcript of Dec. 5, 2003, at 77, 93, 96.

Indeed, if one analyzes all of the terms and conditions of the Leases between Grubbs and Banc One, it is clear that sensible economics dictate that the Equipment be purchased under the Early Buyout Option. That is, the only economically sensible course for Grubbs, absent default,

was to exercise the Early Buyout Option as testified to by Grubbs' chief financial officer. It was the clear intent of Grubbs, based on the economics of the Leases at their inception, to exercise the Early Buyout Options as they became available.

Indeed, the advantages to Grubbs are obvious. Grubbs has the right to obtain ownership at the lowest finance charge. While it appears likely that Banc One would accept the Minimum Value percentage in deriving the purchase price under the second alternative, the overall cost to the Debtor will still be more than the EBO price. The worst alternative for the Debtor is the third one under which the Debtor must still pay a fair market value which, even if greatly diminished because of the age of the Equipment, would be in addition to $659,020.32 in payments—by far the greatest cost for the Equipment. The additional obligation under the third alternative of refurbishing the Equipment at substantial expense was also financially disadvantageous. Clearly, the cost of performing under the EBO (Alternative # 1) is less than performing under Alternative # 2 or Alternative # 3.

It is also clear that under all three alternatives, Banc One will receive back its principal plus interest and lease-related charges. In fact, as discussed above, one of the factors considered by the Debtor's chief financial officer when he surveyed alternative financing sources in 1998 was a consideration of internal interest rates effectively charged by the various lenders under the EBO alternative. For Banc One, this rate ranges from 5.52 percent to 7.15 percent. It does not appear from the evidence that Banc One ever had an expectation of actually receiving the Equipment back at the end of the Lease terms to be leased again to other lessees.

### b. TRAC Lease.

With respect to the TRAC Lease (Ex. # 6), there is neither a Renew–or–Purchase Addendum nor an Early Buyout Option Addendum. Rather, there is a "Terminal Rental Adjustment Clause Addendum." ("TRAC Addendum").

Under the TRAC Addendum, at the expiration of the TRAC Lease term, Grubbs is obligated to pay to Banc One a final balloon payment equal to 20 percent of the original amount borrowed to finance the acquisition of the Equipment ("Balloon Payment"). The term used to describe the Balloon Payment as defined under the TRAC Addendum is "Estimated Residual Value." The TRAC Addendum requires that the Equipment be sold by Banc One to the "highest bidder," and requires Banc One to apply the net sales proceeds (defined in the TRAC Lease as the "Actual Residual Value") toward Grubbs' Balloon Payment. TRAC Addendum, para. 3(a). Grubbs also has a right to bid on the Equipment. TRAC Addendum, para. 4.

To the extent there is a deficiency in the amount owed by Grubbs on the Balloon Payment after applying the net sales proceeds, Grubbs is required to pay the deficiency amount to Banc One. In the event the Equipment is sold for an amount that exceeds the Balloon Payment, then Banc One is required to pay to Grubbs any such surplus.

The economic substance of the TRAC Lease is no different from a typical installment loan in which the lender has agreed to a balloon payment in lieu of a down payment. Whether characterized as a lease, which uses terms such as "Estimated Residual Value" as a substitute for "balloon" and "rental payments" instead of "installment payments," or characterized as an installment loan, the economic characteristics are identical and can be generically described as follows: The borrower

finances the acquisition of equipment through a loan from a finance company. The loan is repaid over a set term, at the end of which the borrower must make the balloon payment. The "collateral" for the financing is sold at the end of the loan term, and the proceeds are applied toward the borrower's balloon payment. If there is a deficiency, the borrower is responsible for paying it. If there is a surplus, the borrower retains it. The lender has no expectation or right to retain ownership of the "collateral" at the conclusion of the loan period.

### 2. Casualty Loss Damages and Repayment Obligation on Default.

#### a. Casualty Loss Damages.

In the event of a total loss of the Equipment ("Casualty Loss"), Grubbs can either replace the Equipment, or pay an amount equal to all past-due amounts then due and payable by Lessee under the Lease plus the Stipulated Loss Value ("SLV"). Master Lease, para. 9. Under the formula set forth in the Master Lease Agreement, the SLV equals the present value (calculated using the SLV Discount Rate) of: (1) the remaining rents and all other amounts due under the Lease to include any balloon payment (and as to a TRAC lease, the TRAC value as stated in the Schedule), plus (2) an amount equal to the "economic value" (as defined in the TRAC Lease) of the Equipment. The economic value of the Equipment equals the predetermined fair market value at the end of the Lease term as originally anticipated by Lessor at the commencement date as included in the Schedule. The SLV Discount Rate is a discount rate equal to prime on the commencement date of the Lease as set forth in the Schedule, minus two points.

The economic substance of Grubbs' obligation in the event of a Casualty Loss is similar to the TRAC Lease. If the Equip-ment is destroyed, Grubbs is liable for the discounted present value of the future payments. Functionally, this discounting results in Banc One's being repaid its principal then owing. In addition, since the "Economic Value" is one that is predetermined at the inception of the Lease based on a percentage of the amount financed and is not affected by the actual condition of the Equipment at the time it is destroyed, it is in substance simply a fixed balloon payment that the borrower is required to pay. Unlike a TRAC Lease (where the borrower will receive credit for the proceeds realized from sale of the collateral), the loss functionally becomes unsecured, and the borrower is responsible for the entire balance due because there is no collateral remaining to the extent insurance is insufficient to cover the loss.

#### b. Default Damages under Master Lease Agreement.

In the event of a default, Grubbs must pay an amount equal to all past-due amounts then due and payable by Lessee under the Lease plus the SLV plus costs of collection. Master Lease Agreement, para. 15, Ex. # 1. In the event Banc One repossesses the Equipment, it must sell or release the Equipment in a commercially reasonable manner and credit the net proceeds against the Stipulated Loss Value owed by Grubbs. After crediting the net proceeds, Grubbs is still liable for any balance owing toward the SLV.

The economic substance of Grubbs' obligation in the event of a default under a Lease Schedule is also very similar to the TRAC Lease. If Grubbs defaults, it is liable for the discounted present value of the future payments. Functionally, just as in the case of a casualty loss, this discounting results in a financing company being repaid its principal then owed. In addition, because the stipulated loss value is equal to the "Economic Value" (and it is

predetermined at the inception of the Lease based on a percentage of the amount financed and is not affected by the actual condition of the Equipment at the time of default), it is in substance simply a fixed balloon payment that the borrower is required to pay as part of the total financing obligation. Similar to a TRAC Lease, in the event of a default, the borrower will receive credit for the proceeds realized from sale of the collateral.

## C. *Nature of the Banc One Leases.*

The Court concludes that the EBO Leases and TRAC Lease are structured to insure a return of full principal and interest to Banc One either in the event of a default, casualty loss, or under each of the non-default alternatives available to the Debtor. It is also clear that under none of the options available to Grubbs was it within the reasonable expectations of the parties that (at the end of the Lease terms) the Equipment would be returned to Banc One. As discussed above, absent default, a financially healthy Grubbs would choose the option most beneficial to it by exercising the Early Buyout Option. Under the TRAC Lease, the Equipment would either be sold to a third party or to Grubbs immediately upon the termination of the lease—with Grubbs to remain liable for any deficiency in the value of the Equipment or receive the benefit of any surplus. In the event of default or casualty loss under all of the Leases, Grubbs also remains liable for the entire indebtedness after crediting the value of the Equipment or its insurance proceeds. Under all of these scenarios, Banc One gets paid its principal and interest. There was no evi-

dence that Banc One retained any expectation of retaining the Equipment at the end of the lease term for purposes of leasing it again to third parties.

### Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1334(b), 157(b)(1), and 157(b)(2). This is a core proceeding in accordance with 28 U.S.C. sections 157(b)(2)(A), (B), (K), and (O).

I. Characterization of the Leases under U.C.C. Section 1–201(37).[5]

As long ago as 1972, White and Summers, in the first edition of their often-cited Horn Book on the Uniform Commercial Code, noted that the "lease v. security interest" issue is one of the "most frequently litigated issues under the entire Uniform Commercial Code." White & Summers, *Uniform Commercial Code* § 22–3, at 760 (West 1972 edition)("White & Summers 1972 ed."). This theme continues in the most recent version of their treatise where they descriptively recite, "A fecund source of disputes ... is the question whether a particular document labeled a 'lease' is a true lease—and is outside of Article 9 and under Article 2A—or whether it is a security agreement that creates a security interest under the terms of section 1–201(37)." White & Summers, *Uniform Commercial Code* § 30–3 at 11 (West 2002 edition)("White & Summers 2002 ed.")

Indeed, the issue of whether a financing transaction denominated as a "lease" is a true lease or a disguised security agreement is one of the most vexatious and oft-

---

**5.** U.C.C. § 1–201(37) is found in Article 1 of the Uniform Commercial Code, which contains the definitions that govern the meaning and usage of terms as used throughout the Uniform Commercial Code. Subparagraph (37) of U.C.C. § 1–201 contains the definition

of a "security interest" and describes the process for determining whether a transaction creates a security interest or a true lease. U.C.C. § 1–201(37) is, therefore, at the center of all of the litigation that has occurred in this area.

litigated issues under the Uniform Commercial Code. *See In re QDS Components, Inc.*, 292 B.R. 313, 323 (Bankr.S.D.Ohio 2002)(citing *Morris v. U.S. Bancorp Leasing & Fin. (In re Charles)*, 278 B.R. 216, 221 (Bankr.D.Kan.2002) ("The issue of whether so-called 'finance leases' are in reality security agreements has vexed the courts for many years.")); *Carlson v. Giacchetti*, 35 Mass.App.Ct. 57, 616 N.E.2d 810 (1993) ("Whether, under the Uniform Commercial Code, an equipment lease is to be treated as a 'true lease' or as a security agreement is an issue that has been litigated extensively for two decades . . . ."). The problems attendant to distinguishing a lease from an installment sale are not new ones, and the issue has been the subject of litigation in American courts since well before the enactment of the Uniform Commercial Code. *State ex rel. Celebrezze v. Tele–Communications, Inc.*, 62 Ohio Misc.2d 405, 601 N.E.2d 234 (1990)(citing *Hervey v. Rhode Island Locomotive Works*, 93 U.S. 664, 23 L.Ed. 1003 (1876)); Williston, *The Law Governing Sales of Goods at Common Law and Under the Uniform Sales Act* (1st ed.1909), §§ 336, 338; Jones, *The Law of Chattel Mortgages and Conditional Sales* (5 Bowers ed.1933), §§ 934–968. *See also Sight & Sound of Ohio, Inc. v. Wright*, 36 B.R. 885, 887 (S.D.Ohio 1983) (citing White & Summers, 1980 ed., § 22–3, at 878).

From a review of the litigated cases dealing with this issue, it is clear that the distinction between "true lease" and "security agreement" takes on added importance in cases, such as this one, involving a trustee or debtor-in-possession arguing that the "lease" is truly a security agreement and the financing company arguing that the transaction truly is a lease and not a transaction subject to Article 9 of the Uniform Commercial Code.

■ In this regard, White and Summers comment, "Why do secured creditors persist in claiming to be lessors? There are many reasons." White & Summers 2002 ed., § 30–3 c. 1., at 30. In fact, in the bankruptcy arena, the reasons are obvious. The treatment afforded to "true" lessors of personal property is far superior to the treatment given to holders of secured claims. For example, under Bankruptcy Code Section 365, leases are typically assumed or rejected at some point during a bankruptcy case. If the lease is assumed, then any defaults must be cured and adequate assurance of future performance under the lease provided. 11 U.S.C. § 365(b). Importantly, during the time period commencing 60 days after the filing, the trustee or debtor-in-possession must make the contractual payments called for under the lease. 11 U.S.C. § 365(d)(10). Any contractual payments that are missed are typically accorded administrative priority status under section 503 of the Bankruptcy Code.

■ Rather than a lease's being cured of defaults on assumption (as required for a true lease), under a financing agreement, the secured claim is subject to being reduced to the value of collateral under section 506 and the payment terms restructured under the "cram down" provisions of section 1129(b). 11 U.S.C. § 1129(b)(2)(A)(i). *See generally* Collier on Bankruptcy (15th ed.) ¶ 1129.05[2][a] at 1129–130.1; White & Summers 2002 ed., § 30–3 at 13–14.

■ In addition, the interest of a true lessor is not subject to the trustee's "strong arm" powers, which operate to avoid for the benefit of the estate unperfected security interests. 11 U.S.C. § 544(a)(trustee may avoid a transfer or obligation incurred by debtor that is voidable by a creditor on a simple contract that could have obtained a judicial lien);

§ 679.3171(1)(b)1, Fla. Stat. (2000)(an unperfected security interest is subordinate to the rights of lien creditor). That is, in a "worst case" from the lender's perspective, if there is a problem in the loan documentation, such as a failure to file a financing statement or problems with the collateral description or proper name of the debtor, the lien may be subject to avoidance under section 544. *See, e.g., Sommers v. I.B.M.*, 640 F.2d 686, 691 (5th Cir.1981); Collier on Bankruptcy (15th ed.) ¶ 544.05 at 544–10.

■■■ Even if the lessor has filed a financing statement, if the transaction is construed to be a secured transaction not subject to avoidance under section 544, the treatment of a lessor is still superior to that of a holder of a secured claim. For example, in a chapter 11 case when the debtor-in-possession continues to use the collateral, the holder of the secured claim is only entitled to adequate protection fashioned to compensate for the decline in value of the collateral. *In re Delta Resources, Inc.*, 54 F.3d 722, 728 (11th Cir. 1995) *cert. denied*, 516 U.S. 980, 116 S.Ct. 488, 133 L.Ed.2d 415 (1995). If the value of the collateral is less than the amount of the claim, no post-petition interest accrues on the claim. 11 U.S.C. § 506(b); *United Savings Association v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Based on the advantageous treatment to be accorded to lessors of personal property—as opposed to secured lenders of the same property—there is an obvious financial incentive for equipment financiers to structure their financing arrangements as leases, as opposed to security agreements. The tension in the cases dealing with this issue is the finance companies' attempt to draft an agreement in the form of a true lease versus the need to interpret such agreements based on their economic substance as opposed to their form. *See, e.g., Tulsa Port Warehouse Co., Inc. v. General Motors Acceptance Corp.*, 4 B.R. 801, 805 (N.D.Okla.1980), *aff'd*, 690 F.2d 809 (10th Cir.1982)("It is substance and not form which is decisive in determining whether an agreement is intended to create a security interest.").

■■■ Many of the cases that have dealt with this issue have done so under the prior (now revised) definition contained in U.C.C. 1–201(37). The original version of U.C.C. 1–201(37) was substantially rewritten in conjunction with the promulgation of Article 2A in 1987 dealing with personal property leases. Some courts are of the view that the amendment was not intended to change the substantive law. *See, e.g., In re Cole*, 114 B.R. 278, 281 (N.D.Okla.1990); *In re Bumgardner*, 183 B.R. 224, 229 (Bankr.Idaho 1995). A more precise statement of the effect of the change, however, is that revised U.C.C. 1–201(37) adopts an analysis based on the "economic realities." White & Summers 2002 ed., § 30–3c at 23. Accordingly, the cases arising under the prior version of U.C.C. 1–201(37) and applying the "economic realities" test ("Economic Realities Test") are still instructive in interpreting the current version of U.C.C. 1–201(37).

■■■ The Bankruptcy Code's definition of security agreement set forth in section 101(50) is entirely consistent with the approach taken in defining a security agreement under both the new and old versions of U.C.C. 1–201(37). According to the legislative history, "Whether a 'lease' is a true or bona fide lease or, in the alternative, a financing 'lease' or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of the title, the

form of the transaction or the fact that the transaction is denominated as a 'lease.'" *American President Lines, Ltd. v. Lykes Bros. Steamship Co., Inc. (In re Lykes Bros. Steamship Co., Inc.)*, 196 B.R. 574, 580–81 (Bankr.M.D.Fla.1996)(citing S.Rep. No. 989, 95th Cong.2d Sess. 64 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5850).

■ The Master Lease Agreement executed by Grubbs and Banc One has a governing law provision that provides that the law of the state of Ohio shall govern interpretation of the Leases. However, this choice of law does not affect the outcome in this case. A review of the Ohio cases dealing with this issue, most of which are cited herein, demonstrates that Ohio law is entirely consistent with the law as generally applied by the courts throughout the country. Moreover, as recognized by the Ohio courts, "Since the UCC has been adopted by all 50 states, and given the uniformity purpose of the UCC, decisions from other states are relevant." *QDS*, 292 B.R. at 321 (citing *Edison Bros. Stores*, 207 B.R. 801, 809 n. 7 (Bankr.Del.1997)); *Duke Energy Royal, LLC v. Pillowtex Corp. (In re Pillowtex, Inc.)*, 349 F.3d 711, 718 n. 8 (3rd Cir.2003)("Because N.Y. U.C.C. § 1–201(37) is based on the Uniform Commercial Code, decisions from other jurisdictions interpreting this same uniform statute are instructive."). It is clear, therefore, that courts dealing with the lease versus security agreement issue generally look at cases from various jurisdictions. In fact, one of the cases relied on by Florida courts in analyzing this issue is the Ohio case of *Sight & Sound of Ohio*, 36 B.R. at 889, a case that in turn relies for authority on the 1978 former Fifth Circuit case of *Bill Swad Leasing Co. v. Stikes (In re Tillery)*, 571 F.2d 1361 (5th Cir.1978).

■ Some leases are obviously true leases and need very little analysis. The most obvious example of a lease that is unquestionably not a disguised financing arrangement is a typical short-term car rental agreement. No one ever questions such transactions. The rental charges compensate the car rental company for the loss of value over the term of the rental through the actual depreciation due to aging, wear, and obsolescence as well as providing for overhead and a profit margin. There is no question that someone who rents a car is acquiring no equity in the vehicle. At the end of the rental period, the car is returned and the car rental company rents it to another customer.

The drafting of leases has evolved over the years, and the simple older cases of $1 options or plain language making clear the lack of any residual interest on the part of the lessor do not necessitate the analysis required in more artfully drafted leases— where a court must dig below carefully crafted language to determine the actual economic realities of a transaction. As aptly stated by the court in *Celebrezze*, 601 N.E.2d at 239: "The cumulative learning and skill of those who practice in these fields have resulted in agreements of great sophistication and detail, sometimes written for the express purpose of obscuring the character of the agreement. While a document may be denominated a 'lease,' and refer to the parties as 'lessor' and 'lessee,' it may nevertheless be written to accomplish a purpose unrelated to bailment or rental. Consequently, courts and commentators have been required to formulate modes of analyses to uncover the precise nature of the agreement."

The new definition of a security agreement contained in U.C.C. 1–201(37) as adopted in Ohio as Ohio Rev.Code Ann. § 1301.01(KK)(2004)(see also section 671.201(37)(2001), Fla. Stat.)("Revised U.C.C. 1–201(37)"), provides as follows:

(KK)(1) "Security interest" means an interest in personal property or fixtures that secures payment or performance of an obligation.

. . . .

(2) Whether a transaction . . . creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee and if any of the following applies:

(a) The original term of the lease is equal to or greater than the remaining economic life of the goods.

(b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods.

(c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(d) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(3) A transaction does not create a security interest merely because it provides any of the following:

(a) That the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

(b) That the lessee assumes risk of loss of the goods or agrees to pay taxes, insurance, filing, recording, or registra-

tion fees, or service or maintenance costs with respect to the goods;

(c) That the lessee has an option to renew the lease or to become the owner of the goods;

(d) That the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed;

(e) That the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

(4) For purposes of division (KK) of this section, all of the following apply:

(a) Additional consideration is not nominal if, when the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed or, when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised.

(b) "Reasonably predictable" and "remaining economic life of the goods" are to be determined with reference to the facts and circumstances at the time the parties entered into the transaction.

(c) "Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is deter-

mined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the parties entered into the transaction. Otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the parties entered into the transaction.

■ As can be seen, the process of determining whether a "lease" is a true lease as opposed to a security agreement starts with the basic proposition: "Whether a transaction creates a lease or security interest is determined by the facts of each case...." U.C.C. § 1–201(37). In determining whether a lease is a true lease, the form or title chosen by the parties is not determinative. *In re Fleming Companies, Inc.*, 308 B.R. 693, 696 (Bankr.D.Del.2004)(citing *Ford Motor Credit Co. v. Hoskins (In re Hoskins)*, 266 B.R. 154, 159 (Bankr.W.D.Mo.2001)). *See also Liona Corp v. PCH Assoc. (In re PCH Assoc.)*, 804 F.2d 193, 200 (2d Cir. 1986); *In re Homeplace Stores, Inc.*, 228 B.R. 88, 93 (Bankr.D.Del.1998).

■ Revised U.C.C. 1–201(37)(2) then goes on to simplify the process by providing a bright line test, which if the conditions are met, establishes that the agreement is *per se* always a security agreement. Under this test, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease, not subject to termination by the lessee, and: (1) the original term of the lease is equal to or greater than the remaining economic life of the goods; (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods; (3) the lessee has an option to renew the lease for the remaining eco-

nomic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or (4) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

■ Importantly, the four instances in which a lease will always be determined to be a security agreement all relate to the residual value to the lessor of the personal property at the end of the lease term. In this regard, in all four of the instances covered by Revised U.C.C. 1–201(37)(2), the personal property either no longer has any economic value at the end of the lease term when the lessor obtains possession of the property or the lessee has the right to obtain ownership of the property for no additional consideration or nominal additional consideration. Thus, all four of the enumerated instances contemplate that at the end of the lease, the lessor will be paid in full the amounts advanced to purchase the personal property and will thereafter have no anticipation of any remaining investment return from the leased property having received full payment of the financed purchase price.

■ The inquiry does not end there, however. *Sankey v. ABCO Leasing, Inc. (In re Sankey)*, 307 B.R. 674, 680 (D.Alaska 2004). Once the court finds that the leases are not security interests *per se*, it is necessary to examine all the facts to determine whether the economic realities of a particular transaction nevertheless create a security interest. *Id.* (citing *QDS*, 292 B.R. 313, 333). That is, if it is determined that "the transaction is not a disguised security agreement per se, [we] must then look at the specific facts of the case to determine whether the economics of the transaction suggest such a result." *Pillowtex*, 349 F.3d at 717 (citing *In re*

*Taylor,* 209 B.R. 482, 484 (Bankr.S.D.Ill. 1997)). *See also In re American Steel Prod.,* 203 B.R. 504, 506–07 (Bankr.S.D.Ga. 1996) (describing the standards for determining whether a disguised security arrangement exists).

 Accordingly, failure to meet one of these conditions means only that the document is not conclusively a security agreement:

> [T]he pinball has safely rolled past four holes each marked security agreement. Evasion of these four holes does not earn one enough points to become a lessee. Finding economic life beyond the lease term and seeing no nominal consideration option, what should a court do? The court must then answer whether the lessor retained a reversionary interest. If there is a meaningful reversionary interest—either an up-side right or a down-side risk—the parties have signed a lease, not a security agreement. If there is no reversionary interest, the parties have signed a security interest, not a lease.

*Sankey,* 307 B.R. at 680 (citing White & Summers 2002 ed., § 30–3c.1., at 30).

 The central feature of a true lease is the reservation of an economically meaningful interest to the lessor at the end of the lease term. Ordinarily, this means two things: (1) at the outset of the lease the parties expect the goods to retain some significant residual value at the end of the lease term; and (2) the lessor retains some entrepreneurial stake (either the possibility of gain or the risk of loss) in the value of the goods at the end of the lease term. *Id.* (citing Huddleson, *Old Wine in New Bottles: UCC Article 2A Leases,* 39 Ala. L.Rev. 615, 625 (1988), quoted in White & Summers 2002 ed., § 30–3 at 15). Accordingly, even when it is determined that the bright-line test has not been satisfied, an examination of all

the facts and circumstances of the case must still be made to determine whether the agreement in question is a true lease or disguised security agreement. *QDS,* 292 B.R. at 333 (citing *In re Triplex Marine Maintenance, Inc.,* 258 B.R. 659, 669 (Bankr.E.D.Tex.2000)("If a court determines that the [bright-line test] does not compel a conclusion that a security interest was created per se, it should proceed to an examination of all the facts to determine whether the economic realities of a particular transaction create a security interest.")); *Taylor,* 209 B.R. at 484–85 (citing *In re Lerch,* 147 B.R. 455, 460 (Bankr. C.D.Ill.1992)).

 Thus, Revised U.C.C. 1–201(37) shifts the focus from "the intent of the parties" to the "economic realities" of a given transaction in determining whether the transaction is a true lease or a disguised security arrangement. *Hanes v. Vital Products Co. (In re Vital Products Company),* 210 B.R. 109, 112 (Bankr. N.D.Ohio 1997); *In re Our Secret, Ltd.,* 282 B.R. 697, 702 (Bankr.D.N.M.2002). The Economic Realities Test as set forth in White & Summers, 1980 ed., § 22–3 at 881, states that: "If at the end of the term [of the lease], the only economically sensible course for the lessee is to exercise the option to purchase the property, then the agreement is a security agreement." *QDS,* 292 B.R. at 325 (citing *Steele v. Gebetsberger (In re Fashion Optical, Ltd.),* 653 F.2d 1385, 1389 (10th Cir.1981))(in turn, quoting *Percival Constr. Co. v. Miller & Miller Auctioneers, Inc.,* 387 F.Supp. 882, 885 (W.D.Okla.1973), *aff'd, in part, rev'd in part,* 532 F.2d 166 (10th Cir. 1976)). *See also Dicker & Campo,* 7 Am. Bankr.Inst. L.Rev. at 544–45 ("[A]nother common law test used by courts deciding cases under ... Old UCC [§ 1–201(37) ] is the so-called 'economic realities test' which .... provides that if at the end of the

lease term, the only economically sensible course for the lessee to take is to exercise the option to purchase the property, then the lease is a security agreement.").

■ The Economic Realities Test requires an analysis of all terms and conditions of a purported lease transaction to determine whether the lessee has no sensible alternative other than to exercise the purchase option. *See, e.g., Lykes,* 196 B.R. at 581–82 (finding that debtor had no sensible alternative other than to pay $44 million to purchase leased equipment as opposed to paying $91 million in rent for an additional five years and, therefore, the purchase option was nominal); *In re Cook,* 52 B.R. 558, 563 (Bankr.D.N.D.1985) (cost of removal of "leased" irrigation equipment "really leaves [the lessee] with no choice at the end of the lease term" other than to exercise the purchase option); *Sight & Sound of Ohio,* 36 B.R. at 889–90 ("[T]he only really plausible alternative available to [the] lessee at the end of the ... lease agreement would be to purchase refrigerator outright ... [for] the option price of $69.75 [rather than continuing to rent refrigerator at $717.60 per year].""); *In re Berge,* 32 B.R. 370, 372–73 (Bankr. W.D.Wis.1983) (noting that "if the fair market value of the property contemplated at the end of the lease term was less than the cost of reassembly and transport of the equipment to the lessor .... the exercise of the option would be virtually 'compelled' or the 'only sensible course,' and the consideration [required to exercise the option] ipso facto nominal"); and Richard L. Barnes, *Distinguishing Sales and Leases: A Primer on the Scope and Purpose of UCC Article 2A,* 25 U. Mem. L.Rev. 873, 885 (1995)("The option price is nominal if the sensible lessee would in effect have no choice [other than to exercise the purchase option] and, in making the only sensible choice, would cut off the lessor's reversion-ary interest. Where a person is left with no real economic choice, the price of taking the action must be nominal."). See also *Royal Food Markets, Inc. v. U.S. Berkel Food Machines, Inc. (In re Royal Food Markets, Inc.),* 121 B.R. 913, 915 (Bankr. S.D.Fla.1990); *Equilease Corp. v. AAA Machine Company, Inc. (In re AAA Machine Company, Inc.),* 30 B.R. 323, 324–25 (Bankr.S.D.Fla.1983); *Percival Constr. Co. v. Miller & Miller Auctioneers, Inc.,* 532 F.2d 166, 172 (10 Cir.1976); *In re International Plastics, Inc.,* 18 B.R. 583, 587 (Bankr.D.Kan.1982); *In re Dunn Bros. Inc.,* 16 B.R. 42, 45 (Bankr.W.D.Va.1981); *Bankers Trust Co. v. Seidle (In re Airlift International, Inc.),* 70 B.R. 935, 939 (Bankr.S.D.Fla.1987); *In re Phoenix Pipe & Tube, L.P.,* 154 B.R. 197, 200 (Bankr. E.D.Pa.1993)("If sensible economics dictate that the equipment be purchased, then the agreement is a financed sale and not a true lease."); *In re Victoria Hardwood Lumber Co., Inc.,* 95 B.R. 947, 953 (Bankr.S.D.Ohio 1988); *In re Aspen Impressions, Inc.,* 94 B.R. 861, 866 (Bankr. E.D.Pa.1989).

As stated by the court in *AAA Machine,* 30 B.R. at 324: "The Court finds from the evidence presented and considering the total sum of 'lease payments' to be made that the only economically sensible course for the 'lessee' to take at the end of the term would be to exercise the option. Having made such a finding the Court concludes that the consideration given for the purchase options was nominal and as such the agreements must be leases intended for security pursuant to Fla. Stat. § 671.201(37)." The Economic Realities Test has also been variously referred to as the "sensible person test." *See Triplex,* 258 B.R. at 671. Put another way, it is the "No Lessee in its Right Mind Test." *QDS,* 292 B.R. at 329, n. 7 (citing *Morris v. Dealers Leasing, Inc. (In re Beckham),*

275 B.R. 598, 603 (D.Kan.2002), *aff'd,* 52 Fed.Appx. 119 (10th Cir.2002)).

As stated by The Honorable Alexander L. Paskay in *Lykes,* 196 B.R. at 580, "One must view the transaction not only in a pure pragmatic and technical legal point of view but also by taking into account all the economic factors which drove the transaction and which were the prime impetus to the ultimate decision to enter into the transaction and the reasons for structuring the transaction as it was done." The analysis should focus on whether the lessee has no plausible alternative but to exercise the option either because of the substantially greater market value of the property at the date the option may be exercised, or because of other factors relevant to the particular agreement, such as those present in this case (i.e., the substantially less attractive option to continue renting the property or purchase it outright for a comparatively nominal amount). *See also Sight & Sound of Ohio,* 36 B.R. at 890.

The "sensible person" test provides that "where the terms of the lease and option to purchase are such the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest." *Triplex,* 258 B.R. at 671 (citing *Fashion Optical,* 653 F.2d at 1389; *In re Howell,* 161 B.R. 285, 289, n. 3 (Bankr.N.D.Fla. 1993)). "Articulated in a less genteel manner, 'if only a fool would fail to exercise the purchase option, the option is generally considered nominal and the transaction characterized as a disguised security agreement.' " *Howell,* 161 B.R. at 289 (citing *Taylor,* 209 B.R. at 486). "No matter how the option amount is expressed, if the only sensible course of action is to exercise the option, then it is one intended for security." *Id.* (citing Barnes, 25 U. Mem.

L.Rev. at 885 and cases cited therein [summarizing that "the option price is nominal if the sensible lessee would in effect have no choice and, in making the only sensible choice, would cut off the lessor's reversionary interest."] ).

The Economic Realities Test focuses on all the facts and circumstances surrounding the transaction as anticipated by the parties at contract inception, rather than at the time the option arises. *QDS,* 292 B.R. at 329 (citing *Kimco Leasing, Inc. v. State Bd. Of Tax Comm'rs,* 656 N.E.2d 1208, 1218 (Ind. Tax Ct.1995)); Huddleson, 39 Ala. L.Rev. at 633 ("Transactions are not true leases where the parties anticipate, at the outset of the transaction, that the option will be irresistible...").

One of the factors considered both in the context of the Economic Realities Test and the application of Revised U.C.C. 1–201(37)(a)(4)("the lessee has the option to become the owner for ... nominal consideration ...") is whether the option price is nominal. If the price is nominal, the agreement is a security agreement. Importantly, Revised U.C.C. 1–201(37)(c)(1) states that "[a]dditional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised."

In *Lykes,* 196 B.R. at 582, Judge Paskay was presented with a complex set of facts and an option price "[o]ne must concede at first blush was facially not nominal at all, in that in order to exercise the option, Lykes was required to pay Blue Water the greater of the fair market value of the vessels or $44.4 million dollars. If this provision is viewed in a vacuum and any other surrounding provisions are disregarded, one might conclude that this is a true lease with an option to purchase."

However, looking at the economic realities of the entire transaction, Judge Paskay observed that if Lykes did not exercise the option, it would have a remaining obligation to make charter payments for an additional five years which would total $91 million. Under such circumstances, as a matter of common sense and sound economics, it would have made no sense for Lykes to pay $91 million in rent for the five years following the year 2002, when it could purchase the vessels in the year 2002 for the greater of their fair market value or $11.1 million each. *Id.*

■ Some courts have taken the simplistic view that a fair market value option—no matter what the underlying economics of the transaction—precludes a finding that the agreement is a security agreement. To the contrary, there is substantial authority that if the "economic realities" dictate otherwise, the inclusion of a fair market value option (and even the total absence of any option at all) does not require a finding that the agreement is a true lease. "However, such a mechanical application of that subsection without recognition of the existing economic realities of the transaction belies the very standard that § 1.201(37) seeks to impose." *Triplex,* 258 B.R. at 671 (citing *Howell,* 161 B.R. at 290, n. 4 ["A finding that the consideration paid for exercising a purchase option approximates the subject property's fair market value does not preclude a finding that the consideration is still nominal when reviewing all the facts and circumstances involved in the transaction."]). Even with such a purchase option standard, "the 'lease' will still be deemed one intended as security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot." *Fashion Optical,* 653 F.2d at 1389. Thus, whether viewed in the context of the bright-line factor

articulated in § 1.201(37)(B)(iv) or under an application of the general rule to examine all of the surrounding economic circumstances of the transaction, a transaction will be considered to be a security agreement notwithstanding of the inclusion of a fair market value option if the economic realities otherwise indicate. *Id.*

■ Perhaps the most revealing provisions of the "lease agreement" are those relating to "termination" and "return of vehicle." *Tillery,* 571 F.2d at 1365. Often such provisions in a termination formula recognize the equity of the "lessee" in the equipment because the lessee is required to bear the loss or receive the gain from its wholesale disposition. In this regard, an equity in the "Lessee" is one of the distinctive characteristics of a lease intended for security. *Id.* As stated in the case of *In re Royer's Bakery, Inc.,* 1 UCC Rep. Serv. 342 (Bankr.E.D.Pa.1963): "Whenever it can be found that a lease agreement concerning personal property contains provisions the effect of which are to create in the lessee an equity or pecuniary interest in the leased property the parties are deemed as a matter of law to have intended the lease as security within the meaning of Sections 9–102 and 1–201(37) of the Uniform Commercial Code."

■ Accordingly, the default and remedies provision of the BancOne Leases in this case also provide further insight as to whether the Lease was intended as security. The Leases provide that in the event of default by the lessee, the lessor may repossess the Equipment and resell the Equipment. This provision further provides that in the event Lessor takes possession of the Equipment, Banc One must give Grubbs credit for any sums received by Lessor from the sale or rental of the Equipment after deduction of the expenses of sale or rental and Lessor's residual interest in the Equipment. This provision

recognizes the creation of an equity or pecuniary interest in the lessee. *Royal Food,* 121 B.R. at 916 (citing *Dunn,* 16 B.R. at 45). Upon the recognition of such an interest, the parties are deemed as a matter of law to have intended the lease as security. *AAA Machine,* 30 B.R. at 325. For instance, if the lessee is entitled to any surplus of proceeds after the lessor claims liquidated damages under the agreement, then the agreement recognizes an· "equity" in the lessee. *Dunn,* 16 B.R. at 45 (citing *Tillery,* 571 F.2d at 1365; *In re Brothers Coach Corp.,* 9 UCC Rep. Serv. 502, 503 (E.D.N.Y.1971)).

On the other hand, the Leases provide that in the event that there is a deficiency after a repossession and sale, the lessor may recover the deficiency from the lessee. This provision also recognizes the creation of an equity or pecuniary interest in the lessee. *AAA Machine,* 30 B.R. at 325 (citing *Dunn,* 16 B.R. at 45). Upon the recognition of such an interest the parties are deemed as a matter of law to have intended the lease as security. *Id.* (citing *Royer's Bakery,* 1 UCC Rep. Serv. 342; *In re Mountain Carpet, Inc.,* 11 B.R. 729, 731 (Bankr.D.Vt.1979)).

Indeed, this latter factor—whether the lessee acquires an ownership interest or equity in the property—has been described as "the pivotal issue in characterizing a lease purchase agreement." *Airlift International,* 70 B.R. at 939 (*citing Dunn,* 16 B.R. at 45). This is particularly true in TRAC leases, also commonly referred to as open-end leases, which contain no option to purchase. The typical TRAC lease includes termination and default provisions under which the lessee is obligated at termination to return the vehicle to the lessor. At that time, the lessor is required to dispose of the vehicle at wholesale in a commercially reasonable manner. If the amount realized at this sale exceeds the agreed depreciated value, the lessee receives the surplus. If the sale amount is less than the agreed depreciated value, the lessee is liable to the lessor for the deficit. *Tulsa Port Warehouse Co., Inc. v. General Motors Acceptance Corp.,* 690 F.2d 809, 811 (10th Cir.1982).

For example, in *Tillery,* decided under Ohio law, the court considered an open-end lease agreement substantially similar to the TRAC Lease in this case and concluded that "(t)he termination formula recognizes the equity of the 'Lessee,' in the vehicle because he is required to bear the loss or receive the gain from its wholesale disposition." *Tillery,* 571 F.2d at 1365 ("But upon closer examination it is obvious that [the lease's] real purpose and intent is obfuscated by its terminology; and … after a careful analysis of its terms and conditions and the rights and obligations of the parties thereto, that it is in *reality* a 'lease intended for security.' "). *Id.*

■ Finally, as noted above, a provision requiring return of the leased property at the end of the term does not negate the possibility of the agreement being a security agreement. *Dunn,* 16 B.R. at 45 (citing 1 Anderson on U.C.C. § 1–201:14 (2d ed.1979)). See also *Tillery,* 571 F.2d at 1366 ("Likewise, although the agreement does not specifically contain an option to purchase, such an omission is not controlling."). That is, even when a lease does not contain a purchase option, the lease "will still be deemed one intended as security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot." *Tulsa Port,* 690 F.2d at 811 (quoting *Fashion Optical,* 653 F.2d 1385, 1388–89). There are also cases where the option to purchase was considered not dispositive or of secondary importance because other evidence showed that the "lessee" was acquiring an equity interest in the property.

*Celebrezze,* 601 N.E.2d at 241; *Tillery,* 571 F.2d at 1365; *In re Wheatland Elec. Products Co.* 237 F.Supp. 820 (W.D.Pa.1964); *Indus. Leasing Corp. v. Sabetta,* 16 UCC Rep. Serv. 195 (Bankr.D.Conn. May 22, 1974).

▉ In addition, the totality of the other rights and responsibilities of the parties to the transaction are still relevant in considering the economic realities of the transaction. See, e.g., *Airlift International,* 70 B.R. at 939. The Court concludes that the facts of this case clearly establish (and are without material dispute) that the transactions between Grubbs and Banc One are security agreements governed by U.C.C. Article 9. The facts that support this conclusion are described above and include the following:

1. The transaction was intended to finance the acquisition of Equipment purchased by Grubbs from third-party vendors.

2. Grubbs is responsible for all problems relating to the delivery to Grubbs of the Equipment from the third-party vendors.

3. Banc One is not in the business of leasing equipment other than through the type of financing that was done in this case—that is, unlike a rental car company or furniture lessor, it does not maintain an inventory of equipment.

4. Grubbs is liable unconditionally for all rental payments and without regard to whether the Equipment is defective.

5. Grubbs bears the risk of any loss.

6. Grubbs is obligated to insure the Equipment.

7. Grubbs is responsible for the payment of all taxes associated with the leased property.

8. The lease specifically excluded any warranties.

9. Grubbs is responsible for all repairs and maintenance to the Equipment.

10. The economics of each individual lease transaction was premised upon the certainty of a return to Banc One of its entire principal and a predetermined calculated interest rate.

11. To the extent that Banc One anticipated a further return on the financing as a result of advantageous federal tax law, the Master Lease Agreement provided that Grubbs would indemnify Banc One for any losses as a result of any change to federal tax law resulting in a reduction of the benefits anticipated by Banc One at the commencement of the Lease schedule.

12. The Master Lease Agreement contains a general indemnity clause under which Grubbs is liable to Banc One for any losses to which Banc One may be exposed "of whatsoever kind and nature" relating to Banc One's "ownership" of the Equipment.

13. The key factor considered by Grubbs' chief financial officer in his decision to finance the Equipment with Banc One (as opposed to the numerous other finance companies considered), was the effective interest rate charged by Banc One for its financing under the Early Buyout Option Addendum.

14. The cost of performing under the Early Buyout Option (Alternative # 1) is less than performing under the other available alternatives.

15. There was no evidence that Banc One retained any expectation of retaining the Equipment at the end of the Lease term for purposes of leasing it again to third parties.

16. Grubbs did not have any other choice from an economic perspective other than to purchase the Equipment

under the Early Buyout Option Addendum. This price was determined in advance and in no way depended on a future valuation. This amount was relied on by Grubbs as a way to obtain ownership at the lowest finance charge.

17. If one analyzes all of the terms and conditions of the Leases between Grubbs and Banc One, it is clear that sensible economics dictated that the equipment be purchased under the Early Buyout Option. That is, the only economically sensible course for Grubbs, absent default, was to exercise the Early Buyout Option as testified to by Grubbs' chief financial officer. It was the clear intent of Grubbs—based on the economics of the Leases at their inception—to exercise the Early Buyout Options as they became available. The fact that Grubbs later experienced financial problems, leading to a default under the Leases and the filing of its bankruptcy, does not change the economics of the transaction.

18. Moreover, the default and remedy provisions of the Lease are similar to those found in a typical financing arrangement—that is, in the event of default or casualty loss, Grubbs also remains liable for the entire indebtedness after crediting the value of the Equipment or its insurance proceeds.

In summary, it is clear that given the Court's factual findings concerning the economic realities of these transactions, the proper characterization of the Leases is as security agreements under Revised U.C.C. 1–201(37) and not as true leases.

## II. The Effect of Banc One's Pre–Petition Termination of the Leases.

Banc One's primary argument throughout these proceedings is that it terminated the leases prior to the bankruptcy and such termination "negates this Court's authority to reinstate or reform the Lease contract." Banc One Leasing Corporation's Post–Trial Brief in Support of Its Motion (Doc. No. 737) at 7. Indeed, there is substantial authority for the proposition that when an executory contract is terminated prior to a bankruptcy petition being filed, that there is nothing left for a debtor-in-possession to assume under section 365, which deals with the rights of a trustee or debtor-in-possession with respect to executory contracts.

Banc One cites as a "decision squarely on point," the case of *Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.)*, 136 B.R. 636, 639 (Bankr.S.D.N.Y. 1992). Indeed, this Court agrees with the reasoning set forth in the *Comp III* case. However, the *Comp III* case, as well as the other cases relied upon by Banc One in support of this argument, are factually inapposite. For example, in the *Comp III* case, the executory contract was a franchise agreement and indisputably an executory contract under which the debtor operated its Computerland retail outlet. Foolishly, the day before its bankruptcy filing, the debtor announced to the franchisor its intention to file chapter 11 the following day. The franchisor, obviously having astute legal counsel, immediately invoked its existing right to terminate the franchise prior to the filing of the petition. Thus, in *Comp III*, the court did not have the issue before it that predominates this case, that is: What is the nature of the underlying transaction? Is it an executory contract that could have been terminated in the manner argued by Banc One? Or, is it a security agreement under which Grubbs is the owner and Banc One the secured creditor?

None of the cases cited by Banc One applies to the situation presented by the facts of this case. In fact, other than the *Comp III* case discussed above and the

*Estep* case discussed below, all of the cases involved the very common situation of a debtor's rights under leases of real estate. *Bell v. Alden Owners, Inc.*, 199 B.R. 451 (S.D.N.Y.1996)(lease in apartment cooperative); *In re Robinson*, 169 B.R. 171 (N.D.Ill.1994), *aff'd*, 54 F.3d 316 (7th Cir. 1995)(lease of apartment); *Ross v. Metropolitan Dade County*, 142 B.R. 1013 (S.D.Fla.1992), *aff'd*, 987 F.2d 774 (11th Cir.1993)(lease of public housing unit); *In re Fidelity American Mortgage Co.*, 19 B.R. 568 (Bankr.E.D.Pa.1982)(apartment complex); *Executive Square Office Building v. O'Connor*, 19 B.R. 143 (Bankr.N.D.Fla.1981)(office space). The closest factually analogous case is *Estep v. Fifth Third Bank (In re Estep)*, 173 B.R. 126 (Bankr.N.D.Ohio 1994). In that case, two issues were litigated. First, the court initially considered whether the lease of a truck was a true lease or a security agreement. It was only after the court had analyzed the lease under U.C.C. 1–201(37) and had determined that the agreement was in fact a "true lease" that the court went on to the second question of whether the lease was validly terminated prepetition and not subject to being assumed under section 365.

■ Here, the threshold question that must first be addressed is whether the transactions are true leases or financing agreements. If they are not true leases, they are not executory contracts subject to pre-petition termination. Banc One's arguments are therefore based upon a false premise. The false logic is as follows: If the leases are true leases and therefore executory contracts subject to pre-petition termination, then since they were terminated prior to bankruptcy, this Court cannot now decide whether or not they were true leases. This Court is reminded of a similarly illogical argument quoted by Judge Roney in the case of *Barnette v. Evans*, 673 F.2d 1250, 1252 (11th Cir.1982), "If we had some ham, we could have ham and eggs, if we had some eggs."

### III. Perfection of Banc One's Security Interest.

■ Grubbs and its primary secured creditor, SouthTrust Bank, contend that Banc One failed to perfect its security interest and that, therefore, Banc One's claims are unsecured. Indeed, having found that the Leases are security agreements, any lien rights that Banc One has may be subject to avoidance under the "strong arm" powers which operate to avoid for the benefit of the estate unperfected security interests. 11 U.S.C. § 544(a). That is, a failure to file a proper financing statement makes any lien subject to avoidance under section 544. *See, e.g.*, *Sommers v. I.B.M.*, 640 F.2d at 691; Collier on Bankruptcy (15th ed.) ¶ 544.05 at 544–10.

■ In this case, the UCC–1 financing statements that were filed to perfect the liens of Banc One are signed by an unidentified person signing for Grubbs Construction Company as "Attorney–in–Fact." Under the individual Lease Schedules, Grubbs, as Lessee, "hereby irrevocably appoints Lessor as Lessee's attorney-in-fact with full power and authority in the place of Lessee and in the name of Lessee to prepare, sign, amend, file or record any Uniform Commercial Code financing statements or other documents deemed desirable by Lessor to perfect, establish or give notice of Lessor's interests in the Equipment or in any collateral as to which Lessee has granted Lessor a security interest." Lease Schedules, para. 10, Exs. # 2, 4, 8, and 10.

In this case, the UCC–1 financing statements were executed and filed with the Florida Secretary of State contemporaneously with the execution of the related

Lease Schedules. They were kept in the ordinary course of business by Banc One as part of its business records in connection with its financing of the subject Equipment. They were so identified by the Banc One loan officer with primary responsibility for the loans and relevant files. Accordingly, the Court finds that they are what they are claimed to be: that is, they are the UCC–1 financing statements that were filed in connection with the financing transactions, and are, therefore, both authentic and have sufficient circumstantial guarantees of their trustworthiness. Fed.R.Evid. 901(b)(1) and 807.

Grubbs and SouthTrust contend that the failure to attach the evidence of the authority of Banc One to actually sign as "attorney-in-fact" makes the UCC–1 financing statements ineffective under the authority of the cases of *In re Duffin,* 1999 WL 33486712 (Bankr.D.Idaho 1999) and *In re Goolsby,* 284 B.R. 638 (M.D.Tenn.2002). Both cases are readily distinguishable from the facts of this case. *Duffin* dealt with financing statements that contained numerous errors to include an improper description of the collateral that the court found would be "seriously misleading" to subsequent creditors inquiring about the existence of the lender's security interest. *Duffin,* 1999 WL 33486712 at *4. Furthermore, the UCC–1 financing statements contained no description of the real estate upon which the crops were to be grown. *Id.* at *6. In that context, the court went on to consider if allowing the use of an "attorney-in-fact" clause was contrary to public policy. In conducting its analysis, the court noted, "[w]hether contractual language is contrary to public policy is a determination made after examining the facts and circumstances of each case." *Id.* at *7.

The *Duffin* court then went on to conclude that allowing a secured creditor to "contract away" the requirement of the Idaho statute and related Idaho regulation violated public policy. This Court is unaware of any statutory support or case law authority for the proposition that the use of an "attorney-in-fact" provision in a financing document is against Florida or Ohio public policy. In fact, no such authority exists. Moreover, in this Court's experience, these types of clauses are used routinely in financing transactions. While there is authority for the proposition that powers of attorney are to be strictly construed and must be closely examined in order to ascertain the intent of the principal—see 2 Fla. Jur.2d *Agency and Employment § 30 at 604* (2004)—there is no dispute in this case that the UCC–1 financing statements were part of the normal and typical loan documentation connected with obtaining the financing for the subject Equipment.

Similarly, *Goolsby,* the other case cited by Grubbs and SouthTrust, is also factually distinguishable. In that case, the lender's employee, Kelly Seward, signed for the debtor as simply, *"Kelly Seward."* No indication was made that the signer was signing in a representative capacity. The court noted that in the analogous situation of a corporate representative signing, that it would be sufficient to include the title, "Pres." or "Sec." to be sufficient as a signature of the principal. In fact, in this case, the signature blank clearly contained a legend that it was being signed by "Grubbs Construction Company," through an "Attorney–in–Fact." See, e.g., Ex. # 3. *See Grieb Printing Co.,* 230 B.R. 539, 541 (Bankr.W.D.Ky.1999)(where debtor expressly authorized secured creditor to sign financing statement on behalf of debtor, a financing statement signed as "attorney-in-fact" was effective to perfect the security interest).

724

Accordingly, the Court finds that the UCC–1 financing statements were validly executed and were effective to perfect Banc One's liens on the Equipment.

### Conclusion

For the foregoing reasons, the Court concludes that the lease transactions between Grubbs and Banc One are in the nature of security agreements and not true leases. The facts are substantially without dispute and clearly establish a relationship under which it was never contemplated that Banc One would retain a meaningful reversionary interest in the Equipment. Rather, the only sensible course, absent default, was for Grubbs to exercise the Early Buyout Option under the EBO Leases. Similarly, in the event of default, the Leases provided to Banc One remedies that were the same as those that typically appear in security agreements.

The TRAC Lease is structured in all respects as a financing transaction wherein Grubbs would be responsible for the principal financed together with a predetermined interest rate and would receive credit for any surplus and be responsible for any deficiency in the collateral.

Banc One's argument that it terminated the Leases prepetition does not prevent this Court from determining their legal character. This argument presupposes that the true character of the Leases is that of "true leases" as opposed to security agreements. Banc One's termination argument is available only if the Court determines that the transactions are true leases. The Court has determined otherwise.

Finally, the signing of the UCC–1 financing statements by an employee of Banc One as "Attorney–in–Fact" was clearly authorized by the terms of the Lease Schedules. Accordingly, Banc One's security interests were properly perfected in the Equipment.

A separate order shall be entered consistent with this opinion.