**GIBRALTAR FINANCIAL CORP.,** Appellant–Plaintiff,

v.

**PRESTIGE EQUIPMENT CORPORATION, National Machinery Exchange, Inc., Key Equipment Finance, Inc. f/k/a Key Corporate Capital, Inc., and Chikol Equities, Inc., Appellees–Defendants.**

No. 20A03–0910–CV–495.

Court of Appeals of Indiana.

April 14, 2010.

R. Brock Jordan, James E. Rossow, Jr., Rubin & Levin, P.C., Indianapolis, IN, Attorneys for Appellant.

William G. Lavery, Whisler & Lavery, Elkhart, IN, Attorney for Appellees Key Equipment Finance and Chikol Equities.

Cynthia S. Gillard, Dean E. Leazenby, Warrick & Boyn, LLP, Elkhart, IN, Attorneys for Appellees Prestige Equipment Corp. and National Machinery Exchange.

## OPINION

BAKER, Chief Judge.

To paraphrase Sigmund Freud, sometimes a lease is just a lease. The appellant herein argues that a lease entered into between two businesses was actually a disguised sale subject to an unofficial security interest. After applying the relevant statute and examining the underlying circumstances of the transaction, we find that the lease was just that—a lease.

Appellant-plaintiff Gibraltar Financial Corp. (Gibraltar) appeals the trial court's order granting summary judgment in favor of appellees-defendants Prestige Equipment Corp. (Prestige), National Machinery Exchange, Inc. (NME), Key Equipment Finance, Inc. f/k/a Key Corporate Capital, Inc. (Key), and Chikol Equities, Inc. (Chikol) on Gibraltar's complaint for conversion, replevin, and a money judgment. Gibraltar argues that there are genuine issues of material fact rendering summary judgment inappropriate at this juncture. Finding no error, we affirm.

## FACTS

Gibraltar is a secured creditor of Vitco Industries, Inc. (Vitco) by virtue of several loan agreements. Pursuant to those loan agreements, Vitco granted Gibraltar a security interest in substantially all of its tangible and intangible personal property, including inventory, investment property, general intangibles, and equipment. It is undisputed that Gibraltar has perfected its security interest.

Vitco manufactured porcelain enameled goods in Napanee. In April 2004, Vitco purchased a Punch Press from the manufacturer for $243,000. Eight months later, in December 2004, Vitco sold the Punch Press to Key for $243,000. On December 29, 2004, Key and Vitco entered into a six-year Lease Agreement (the Lease) whereby Key leased the Punch Press to Vitco in exchange for monthly payments in the amount of $3,591.91. The Lease provides that it is governed by Colorado law.

The Lease contains an Early Buyout Option (EBO) that provides that after sixty months, Vitco had the option to purchase the Punch Press for $78,464.70, or almost 33% of the total cost of the Punch Press. The EBO states that the price "represents the parties' present best estimate of the fair market value of the Equipment on the EBO Date determined by using commercially reasonable methods which are standard in the industry." Appellant's App. p. 121.

If Vitco did not exercise the EBO by the EBO Date, the Lease provided that at the end of the Lease term—twelve months after the EBO Date—Vitco could either purchase the Punch Press for fair market value, renew the Lease for the fair market renewal rental value, continue the Lease on a month-to-month basis at the current monthly rental rate, or return the Punch Press. The Lease provides that the fair market value "means the Equipment's val-

ue as determined between Lessor and Lessee, based upon a price which would be obtained in an arms-length transaction between an informed and willing lessor or seller ... and an informed and willing lessee or buyer...." *Id.* at 114. If Vitco elected to surrender the Punch Press to Key, it was to pay to rig, remove, and transport the Punch Press to a location determined by Key, at a cost of approximately $19,500.

By 2007, Vitco had defaulted under the Lease and was no longer in business. In July 2007, Gibraltar filed a separate lawsuit against Vitco for replevin. By agreed order, Gibraltar was awarded final possession of the collateral in which it had a perfected security interest, including Vitco's equipment. Gibraltar conducted an Article 9 sale, and after crediting the sale proceeds, Vitco owes Gibraltar $578,225.77.

On July 19, 2007, Key sold the Punch Press to NME in a joint venture with Prestige, with Chikol acting as broker, for $160,000. NME and Prestige resold the Punch Press to a third party.

On May 7, 2008, Gibraltar filed the instant complaint against Prestige for civil conversion and to recover the value of the Punch Press, alleging that Prestige had acquired the Punch Press subject to Gibraltar's perfected security interest. Prestige filed a third-party complaint against Key and Chikol, seeking indemnification. Gibraltar then amended its complaint to name Prestige, NME, Key, and Chikol as defendants, and included counts seeking conversion, replevin, and a money judgment.

Following a pretrial conference, the parties all agreed that the key issue in the case was whether the Lease was a true lease or merely a disguised security agreement. On March 31, 2009, Key and Chikol filed a motion for summary judgment, arguing that the Lease was a true lease and

that they were entitled to judgment as a matter of law. Thereafter, NME and Prestige joined in the summary judgment motion. Following a hearing, the trial court granted the summary judgment motion on October 2, 2009, finding that the Lease is a true lease and that the defendants were entitled to judgment as a matter of law. Gibraltar now appeals.

## DISCUSSION AND DECISION

### I.  Standard of Review

Summary judgment is appropriate only if the pleadings and evidence considered by the trial court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 909 (Ind.2001); *see also* Ind. Trial Rule 56(C). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning,* 754 N.E.2d at 909. Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* at 908. The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having his or her day in court. *Id.*

### II.  The Nature of the Lease

■ As noted above, the Lease provides that it is governed by Colorado law. The

Colorado statute at issue is modeled after Uniform Commercial Code section 1–201(37). Indiana has adopted substantially the same provision at Indiana Code section 26–1–1–201(37). The relevant Colorado statute provides, in pertinent part, as follows:

(a) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.

(b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:

\* \* \*

(4) The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

\* \* \*

(d) Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised. Additional consideration is not nominal if:

(1) When the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or

(2) When the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed.

(e) The "remaining economic life of the goods" and "reasonably predictable" fair market rent, fair market value, or cost of performing under the lease agreement shall be determined with reference to the facts and circumstances at the time the transaction is entered into.

Colo.Rev.Stat. § 4–1–203.

We must initially focus on subparagraph (b) and apply the two-pronged test contained therein. First, we must determine whether the consideration that Vitco paid to Key for the right to possession and use of Punch Press was subject to termination by Vitco. If we find that it was subject to termination, then the Lease was merely a lease. If, however, we find that the Lease was not subject to termination by Vitco, then we move on to the second prong of the test. Relevant here is subparagraph (b)(4), which requires us to determine whether Vitco had an option to become the owner of the Punch Press for nominal additional consideration upon compliance with the Lease.

## A. Right to Terminate

For a lease to be terminable, the lessee must have the legal right to cease payments and walk away from the lease without further future financial responsibility to the lessor. *In re Bailey,* 326 B.R. 156, 163 (Bankr.W.D.Ark.2005).

The parties essentially agree that apart from the EBO, Vitco had no general right to terminate the Lease. Indeed, the Lease explicitly states as much: "Your obligation to pay the Lease Payments and other lease obligations is absolute and unconditional and is not subject to cancellation, reduction, setoff or counterclaim.... THIS AGREEMENT AND ALL LEASES ARE NON–CANCELABLE." Appellant's App. p. 112 (emphasis in original). What we must determine, therefore, is

whether the EBO constitutes a right of termination.

■ Gibraltar argues that a *termination* clause differs from a *buyout* clause, and we agree. Another court has considered this issue, and found the distinction significant:

> ... an option to terminate a lease differs from a buyout option in that, under a termination clause, a lessee is free to cease performance under the contract without incurring further obligation. In this case, the lease did not provide the debtor with the opportunity to *terminate* the agreement at any time. Rather, in order to be released from this agreement, the debtor was required to purchase the property pursuant to the defendant's buyout schedule. She could not simply return the equipment to the defendant and walk away. The lease here was not subject to termination by the debtor and, therefore, satisfies the first criterion for finding a security agreement....

*In re Taylor*, 209 B.R. 482, 485–86 (Bankr. S.D.Ill.1997) (emphasis in original). Here, likewise, Vitco had no ability under the Lease to terminate the agreement with no further obligation—it could not just walk away. As aptly put by Gibraltar, "buying the equipment does not equate with the ability to walk away from the lease." Reply Br. p. 5. Therefore, we find that the first prong of the test is satisfied and move on to the second prong.

### B. Nominal Consideration

■ Turning to the second prong of the test, we must determine whether Vitco had an option to become the owner of the Punch Press for nominal additional consideration. Gibraltar concedes that the option to purchase the Punch Press at the close of the Lease is subject to more than nominal additional consideration. Instead,

it argues that the EBO afforded Vitco an option to own the Punch Press for nominal additional consideration.

Here, the EBO provides that Vitco could purchase the Punch Press after 60 months for $78,464.70. Gibraltar's expert attested that in his opinion, the Punch Press was worth at least $100,000 in June 2009, when the EBO could have been exercised had Vitco not already been in default. Assuming that to be true, the EBO price constitutes nearly 80% of the equipment's estimated value at that time, which could hardly be said to be nominal. *See In re Gateway Ethanol, L.L.C.*, 415 B.R. 486, 502 (Bankr.D.Kan.2009) (noting that a leading legal source on these issues "opines that any option price above 50% of the predicted fair market value should be accepted as not nominal") (citing 4 White & Summers, Uniform Commercial Code § 30–3(b)(1) (5th ed. 2002 & 2008 Supp.)).

■ Our inquiry does not end there, however, inasmuch as we must examine the cost to Vitco had it *not* exercised the EBO. It has been held that "nominality of the option price amount is determined by comparison of the option amount with the expected value of the [equipment] at the time the option is to be exercised...." *Id.* at 502. More specifically, the statute

> sets forth two tests for determining whether an option price is nominal: (1) the option price is *not* nominal when the option to purchase is stated in the agreement to be the fair market value of the property (the "FMV Standard"); and (2) the option price *is* nominal if it is less than the lessee's reasonably predictable costs of performing under the lease agreement if the option is not exercised (the "Option Price/Performance Cost Test").

*In re QDS Components, Inc.*, 292 B.R. 313, 335 (Bankr.S.D.Ohio 2002) (applying UCC

section that is identical to Colorado statute at issue herein) (emphases added). Gibraltar argues that these statutory sections apply only if an argument is being made that the additional consideration is per se nominal; and it contends that it is making no such argument. The statutory definitions of "nominal" and "not nominal," as described above, are the only such definitions of those terms provided, and no distinction between "per se nominal" and "not per se nominal" is made. Thus, we will rely on the definitions contained within the relevant statute.

Turning first to the FMV Standard, we note that although the purchase option at the end of the Lease term states that the price will be the fair market value of the Punch Press as determined at that time, the EBO applies a fixed price to the value of the Punch Press rather than permitting the price to be determined at the time the option is to be performed. Thus, the FMV Standard has no application here.

Turning next to the Option Price/Performance Cost Test, the *QDS* court explained that this test "requires a comparison of the Option Amount with the Debtor's reasonably predictable cost of performing under the Lease Agreements if the purchase option is not exercised." 292 B.R. at 335. Here, had Vitco declined to exercise the EBO, it would have incurred another twelve months of payments, totaling $43,102.92. If it had then decided to return the equipment, the Lease provides that Vitco was required to return the Punch Press to Key at Vitco's "sole expense[.]" Appellant's App. p. 118. The only evidence in the record regarding the cost to rig, remove, and transport the Punch Press establishes that it would have cost approximately

$19,500. Gibraltar argues that we must focus on a comparison of the cost of exercising the EBO—$78,464.70—with the cost of *not* exercising the EBO— $62,602.92.[1] According to Gibraltar, therefore, the cost to purchase the Punch Press by exercising the EBO is only $15,861.78 more than it would cost to return the equipment. It contends that $15,861.78 is nominal consideration or, at the least, that there is a genuine issue of material fact regarding this issue.

As noted above, however, the statute provides that "[a]dditional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised." Colo.Rev.Stat. § 4–1–203(d). Even if we accept all of Gibraltar's figures, calculations, and evidence, the cost to Vitco of exercising the EBO is still nearly $16,000 more than it would have been to finish the lease and return the equipment to Key. Given this fact, and given that the purchase price of the EBO is nearly 80% of the estimated fair market value of the Punch Press at that time, we find that the additional consideration required by the EBO is not nominal pursuant to the statute.

### C. Economic Realities

Gibraltar argues that application of the statutory test is only the first step in determining whether the Lease is merely a lease. Specifically, "[o]nce the court finds that the leases are not security interests per se, it is necessary to examine all the facts to determine whether the economic realities of a particular transaction nevertheless create a security interest." *In re Grubbs Constr. Co.*, 319 B.R. 698, 714 (Bankr.M.D.Fla.2005). The *QDS* court

---

1. This figure constitutes the cost of twelve more months of payments plus the cost to return the equipment to Key.

phrased the issue as follows: "Did the Lessor[ ] retain a meaningful reversionary interest in the [equipment]?" 292 B.R. at 340–41. In other words, "[i]f a transaction creates a lease and not a security interest, the lessee's interest in the goods is limited to its leasehold estate; the residual interest in the goods belongs to the lessor." UCC § 1–203, Official Comment 2 (2004).

The UCC does not provide an explicit test for reservation of a meaningful reversionary interest, and court decisions "have not adopted a consistent set of factors for identifying a lessor's residual interest." *Gateway*, 415 B.R. at 504. The Lease herein is governed by Colorado law, but we have been unable to find cases from Colorado that are helpful here. We will follow the lead of the *Gateway* court and decline to apply a laundry list of factors identified by other courts; instead, we will focus on the economic factors of the Lease and evaluate whether they establish that Key retained a residual interest in the Punch Press.

The evidence is undisputed that the expected useful life of the Punch Press is fifteen to twenty years. The Lease was merely a six-year contract. Had Vitco decided to return the Punch Press to Key at the expiration of the Lease, the equipment would still have had significant value to Key.

As for the payment terms, Key originally purchased the Punch Press from Vitco for $243,000. If Vitco had made monthly payments as scheduled for sixty months and exercised the EBO, Key would have received a total of $293,979.30 (sixty monthly payments of $3591.91 plus the EBO price of $78,464.70). Had Vitco made monthly payments for the seventy-two month duration of the Lease and returned the Punch Press, Key would have received $258,617.52 over the life of the Lease. Finally, if Vitco had made monthly payments for the duration of the Lease and purchased the Punch Press, Key would have received $258,617.52 plus the fair market value of the equipment at that time. Obviously, under any scenario, the Lease provided for the full price—and then some—to be paid during the Lease term. While this might weigh in favor of a conclusion that this transaction was a disguised security interest, the statute in question explicitly prohibits such a conclusion:

> (c) A transaction in the form of a lease does not create a security interest merely because:
>
> (1) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into . . . .

Colo.Rev.Stat. § 4–1–203(c)(1). Thus, the mere fact that Vitco would have paid more to Key over the course of the Lease than the fair market value of the Punch Press at the time the Lease was executed does not mean that the Lease was actually a security agreement. Similarly, the fact that Vitco was responsible for paying taxes and insurance on the Punch Press does not mean that the Lease was anything other than a lease. *Id.* at § –203(c)(3).

As Key points out, under any of the foreseeable alternatives under the Lease, Key retained a significant residual interest:

> There can be no more meaningful residuary interest to be retained than the right to either have the Punch Press returned, or have it purchased for its fair market value at the end of the lease term. This is especially true when the useful life of the Punch Press unquestionably exceeds the term of the lease.

Appellees' Br. p. 24. We agree with Key that the potential receipt of 33% of the cost of the goods after five years constitutes the retention of a meaningful residuary interest. Given all of the facts and circumstances herein, therefore, we find that Key retained a meaningful residuary interest and that the Lease was merely a lease.

### III. Ownership of the Punch Press

 Finally, Gibraltar argues that there is no evidence in the record establishing that, in fact, ownership of the Punch Press was ever actually vested in Key. The Lease itself, however, states that Key was the Lessor and that Vitco was not permitted to transfer, sell, or assign the Punch Press without Key's prior written consent. Appellant's App. p. 114, 239. The EBO also stated that upon exercise of the option, Key would deliver to Vitco a bill of sale transferring to Vitco "all right, title, and interest in and to the Equipment." *Id.* at 121. And in discovery responses, Key stated that it had "purchased the Punch Press from Vitco on or about December 31, 2004, for $243,000.00. The purchase price was wire transferred by Key Equipment into Vitco's bank account at KeyBank." *Id.* at 269. Finally, Key offered the affidavit of its Senior Vice President and General Counsel, who attested that Key Equipment was the owner of the Punch Press at all times during the term of the Lease. *Id.* at 108–09.

Gibraltar makes much of the fact that there is no purchase agreement or bill of sale in the record establishing that, in fact, Vitco sold the Punch Press to Key in 2004. We do not find that such a document is required to support the conclusion that Key owned the Punch Press. Gibraltar has offered no evidence countering the Lease language or discovery responses of Key, all of which establish that Key did own the Punch Press. Thus, we find no genuine issue of material fact on this issue such that summary judgment was inappropriate.

The judgment of the trial court is affirmed.

DARDEN, J., and CRONE, J., concur.