ATTORNEYS FOR APPELLANT
R. Brock Jordan
James E. Rossow, Jr.
Indianapolis, Indiana

ATTORNEY FOR APPELLEES
KEY EQUIP. FINANCE, INC. &
CHIKOL EQUITIES, INC.
William G. Lavery
Elkhart, Indiana

ATTORNEYS FOR APPELLEES
PRESTIGE EQUIP. CORP. &
NAT'L MACHINERY EXCHANGE,
INC.
Cynthia S. Gillard
Dean E. Leazenby
Elkhart, Indiana

_____



FILED

Jun 21 2011, 1:08 pm

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

_____

No. 20S03-1010-CV-618

GIBRALTAR FINANCIAL CORP.,

*Appellant (Plaintiff below)*,

v.

PRESTIGE EQUIPMENT CORPORATION,
NATIONAL MACHINERY EXCHANGE, INC.
KEY EQUIPMENT FINANCE, INC. F/K/A KEY
CORPORATE CAPITAL, INC., AND
CHIKOL EQUITIES, INC.,

*Appellees (Defendants below)*.

_____

Appeal from the Elkhart Superior Court, No. 20D05-0805-CT-3
The Honorable Charles C. Wicks, Judge

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 20A03-0910-CV-495

_____

**Sullivan, Justice.**

The parties to this lawsuit claim rights to a punch press used in the manufacturing business of now-defunct Vitco Industries, Inc. Gibraltar Financial Corp. holds a perfected security interest in Vitco's tangible and intangible property, including its equipment. The other parties claim that the security interest does not cover the press because the press was not Vitco's equipment; rather, it had been leased to Vitco by Key Equipment Finance, Inc. We find that genuine issues of material fact exist regarding whether the press was leased.

## Background

Vitco Industries, Inc., was a manufacturer of porcelain enameled goods in Napanee, Indiana. In April, 2004, Vitco paid $243,000 for a punch press to use in its business. Roughly eight months later, in December, 2004, Vitco entered into a transaction with Key Equipment Finance, Inc. ("Finance"), in which Finance paid Vitco the same amount, $243,000, and Finance and Vitco executed a contract under which Vitco was entitled to use the punch press in exchange for monthly payments. Finance and Vitco called this contract a "Master Lease Agreement," which we will refer to in this opinion as the "Lease." Consistent with the lease nomenclature, Finance did not file a financing statement in connection with the transaction.

The Lease had the following terms:

- Term: Six years.
- Rent: $3,591.91 per month ($43,102.92 per annum).
- Net Lease Terms: Vitco was required to maintain insurance, pay all personal property taxes, bear all risk of loss, and perform all repairs and maintenance with regard to the press.
- Early Buyout Option ("EBO"): Vitco was entitled to buy the press after five years for $78,464.70 (32.29% of the total cost of the equipment), a price that the Lease recited

2

represented "the parties['] present best estimate of the fair market value of the Equipment on the EBO Date determined by using commercially reasonable methods which are standard in the industry." Appellant's App. 121.

- End-of-Term Options: In the event Vitco did not exercise the EBO, Vitco was required to continue paying monthly rent during the sixth year (total of $43,102.92). At the end of the Lease's six-year term, Vitco could do one of four things:

  (1)   buy the press for fair market value; or
  (2)   renew the Lease for the fair market renewal rental value; or
  (3)   continue the Lease month-to-month at the current monthly rental rate; or
  (4)   return the press to Finance (in which case Vitco would pay for the press's removal and return to Finance, or Finance could attempt to sell the press directly from Vitco's facility).

For purposes of the End-of-Term Options, the Lease defined "fair market value" as "the Equipment's value as determined between Lessor and Lessee, based upon a price which would be obtained in an arms-length transaction between an informed and willing lessor or seller . . . and an informed and willing lessee or buyer." Id. at 114.

Vitco never made it to the point where it could exercise the EBO or otherwise complete the terms of the Lease. By 2007, Vitco was no longer in business and had defaulted under the Lease.

Independent of its dealings with Finance, Vitco had entered into several loan agreements with Gibraltar Financial Corp. pursuant to which it had granted Gibraltar a security interest in virtually all of its tangible and intangible property, including its equipment. It is undisputed that Gibraltar perfected its security interest. In a separate lawsuit filed against Vitco in July, 2007, Gibraltar was awarded possession of the collateral in which it had a perfected security interest, including Vitco's equipment. Gibraltar sold that equipment and credited Vitco with the sale proceeds, but Vitco still owed Gibraltar almost $580,000.

In the meantime, Finance repossessed the press and sold it in July, 2007, for $160,000 to National Machinery Exchange, Inc. ("NME"), in a joint venture with Prestige Equipment Corp.[1]

In May, 2008, Gibraltar filed this action against Prestige to recover the value of the press, alleging that Prestige had acquired the press subject to Gibraltar's security interest. A series of third-party complaints and amendments followed, as detailed in the margin.[2] The parties agreed after a pretrial conference that the dispute turned on whether the Lease was a true lease (as argued by the Defendants) or a sale subject to a security interest (as argued by Gibraltar). The trial court granted summary judgment in favor of the Defendants after concluding that the Lease was a true lease.

The Court of Appeals affirmed the trial court's grant of summary judgment. Gibraltar Fin. Corp. v. Prestige Equip. Corp., 925 N.E.2d 751 (Ind. Ct. App. 2010). Gibraltar sought transfer to this Court, arguing, in part, that the decision of the Court of Appeals in this case conflicted with the prior decision of the Court of Appeals in Gangloff Industries, Inc. v. Generic Financing & Leasing, Corp., 907 N.E.2d 1059 (Ind. Ct. App. 2009). We have granted transfer to reconcile any conflict between these two cases and to clarify Indiana law in distinguishing true leases from sales subject to security interests.[3] Ind. Appellate Rule 58(A); Gibraltar Fin. Corp. v. Prestige Equip. Corp., 940 N.E.2d 828 (Ind. 2010) (table).

## Discussion

## I

Court decisions, treatises, and articles on commercial law are replete with declarations of the difficulty in distinguishing between "true" leases and sales subject to security agreements.

---

[1] Chikol Equities, Inc., acted as a broker for the transaction. NME and Prestige resold the press to a third party.

[2] Gibraltar first filed an action against Prestige. Prestige then filed third-party claims against Finance and Chikol, seeking indemnification. Thereafter, Gibraltar amended its complaint to name Prestige, NME, Finance, and Chikol as defendants and included counts seeking conversion, replevin, and a money judgment. We will refer to Prestige, NME, Finance, and Chikol collectively as the "Defendants."

[3] We summarily affirm the Court of Appeals as to issues not addressed in this opinion. App. R. 58(A)(2).

4

For example, the court in the epic <u>WorldCom</u> bankruptcy case was forced to observe that though the concepts of lease and security agreement "are rather easily defined, the means to distinguish between them in a rigorous manner has often eluded the courts." <u>WorldCom, Inc. v. Gen. Elec. Global Asset Mgmt. Servs.</u> (<u>In re WorldCom, Inc.</u>), 339 B.R. 56, 64 (Bankr. S.D.N.Y. 2006). For their part, White and Summers say that whether a transaction in the form of a lease is characterized as a lease or a sale subject to a security interest is "one of the most frequently litigated issues under the Uniform Commercial Code." 4 James J. White & Robert S. Summers, <u>Uniform Commercial Code</u> 17 (6th ed. 2010).

Our review of the history of these disputes suggests that much of the difficulty arose under the pre-1987 version of the Uniform Commercial Code ("U.C.C."), a uniform law adopted in some version by all 50 states. <u>See</u> <u>In re Edison Bros. Stores, Inc.</u>, 207 B.R. 801, 809 n.7 (Bankr. D. Del. 1997) (noting that the U.C.C. has been adopted by all 50 states). The pre-1987 U.C.C. emphasized the subjective intent of the parties entering into a lease agreement at the time the agreement was made. The Official Comment to post-1987 U.C.C. § 1-203 discusses this problem:

> Reference to the intent of the parties to create a lease or security interest led to unfortunate results. In discovering intent, courts relied upon factors that were thought to be more consistent with sales or loans than leases. Most of these criteria, however, were as applicable to true leases as to security interests. . . . Accordingly, [the 1987 revision of the U.C.C.] contains no reference to the parties' intent.

U.C.C. § 1-203 cmt. 2 (2001) (formerly U.C.C. § 1-201(37)), 1 U.L.A. 28 (2004).[4,5]

---

[4] What is today U.C.C. § 1-203 was denominated § 1-201(37) in the 1987 revision; it was recodified as § 1-203 in Revised Article 1 (2001). However, the Indiana U.C.C. retains the § 1-201(37) denomination. <u>See</u> Ind. Code § 26-1-1-201(37) (2010).

[5] One of the interesting consequences of this de-coupling of parties' intent from the lease-security interest determination is that whether the parties intended the transaction to constitute a lease for tax purposes became irrelevant to the question of whether the transaction constituted a lease or sale subject to a security interest for creditors' rights purposes. <u>See</u> Jeffrey Penfield Trout, Note, <u>From I.T.C. to U.C.C.: Using Federal Tax Criteria to Ensure Lease Treatment Under the Uniform Commercial Code</u>, 1986 Colum. Bus. L. Rev. 233 (arguing that the 1987 revision of the U.C.C. should reflect tax considerations). A comprehensive explanation of the rationales for treating the leased-secured transaction distinction differently in tax and creditors' rights law can be found in Shu-Yi Oei, <u>Context Matters: The Recharacterization of Leases in Bankruptcy and Tax Law</u>, 82 Am. Bankr. L.J. 635, 680-689 (2008).

The parties agree that this dispute is governed by Colorado law. Two sections of the U.C.C. as adopted by Colorado are applicable here. First, the Colorado U.C.C. defines the term "lease" as follows:

> "Lease" means a transfer of the right to possession and use of goods for a term in return for consideration, but a sale, including a sale on approval or a sale or return, or retention or creation of a security interest is not a lease. . . .

Colo. Rev. Stat. § 4-2.5-103(j) (2010).[6] The key thing to note about this definition is that it specifies that a transaction creating a lease and a transaction retaining or creating a security interest are mutually exclusive. E. Carolyn Hochstadter Dicker & John P. Campo, FF&E and the True Lease Question: Article 2A and Accompanying Amendments to UCC Section 1-201(37), 7 Am. Bankr. Inst. L. Rev. 517, 521 (1999).

Colorado has adopted the following provision of the U.C.C. that sets forth rules for distinguishing a transaction creating a lease and a transaction retaining or creating a security interest:

> (a) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.
>
> (b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
>
>> (1) The original term of the lease is equal to or greater than the remaining economic life of the goods;
>>
>> (2) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>>
>> (3) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for

---

[6] The Colorado, Indiana, and U.C.C. versions of the definition of "lease" are identical. See Ind. Code § 26-1-2.1-103(j); U.C.C. § 2A-103(j) (amended 2001), 1C U.L.A. 825 (2004).

nominal additional consideration upon compliance with the lease agreement; or

(4) The lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

(c) A transaction in the form of a lease does not create a security interest merely because:

(1) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

(2) The lessee assumes risk of loss of the goods;

(3) The lessee agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs, with respect to the goods;

(4) The lessee has an option to renew the lease or to become the owner of the goods;

(5) The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(6) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

(d) Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised. Additional consideration is not nominal if:

(1) When the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or

(2) When the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed.

7

(e) The "remaining economic life of the goods" and "reasonably predictable" fair market rent, fair market value, or cost of performing under the lease agreement shall be determined with reference to the facts and circumstances at the time the transaction is entered into.

Colo. Rev. Stat. § 4-1-203. We will refer to this statute as "Colorado § 1-203" or simply "§ 1-203." Colorado § 1-203 is identical to U.C.C. § 1-203.[7]

Because the Lease provides that Colorado law governs the interpretation of its provisions, we will analyze whether the transaction constitutes a lease or sale subject to a security interest according to Colorado § 1-203. But our analysis will include decisions from other state and federal courts interpreting the various state analogs to this section, both because the parties encourage us to do so and because of the nature of uniform laws. See In re Edison Bros. Stores, 207 B.R. at 809 n.7 ("Since the UCC has been adopted by all 50 states, and given the uniformity purpose of the UCC, decisions from other states are relevant." (citation omitted)).

**II**

Although Colorado § 1-203(a) provides that "[w]hether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case," § 1-203(b) dictates that if its specifications are met, the transaction will be deemed to have created a security interest. Thus, Colorado § 1-203(b) provides that if its bright-line test is met, the issue is decided – the transaction has created a security interest and no further inquiry is required.

---

[7] Colorado, like Indiana, has adopted the 2001 Revision of Article 1. U.C.C. § 1-301, 1 U.L.A. 4 (Supp. 2010). But unlike Indiana, the Colorado Legislature in 2006 moved the provisions of prior U.C.C. § 1-201(37) that distinguish "true" leases from security interests to Colorado § 1-203, mirroring the change in made in U.C.C. Revised Article 1. See Col. Rev. Stat. § 4-1-203 note (Editor's Note). Colorado § 1-203 is substantively identical to prior U.C.C. § 1-201(37), except that the definition of "present value" embedded in prior U.C.C. § 1-201(37) has been placed in Colorado Revised Statute section 4-1-201(27). Col. Rev. Stat. § 4-1-203 cmt. As noted in footnote 4, supra, the counterpart provision of the Indiana U.C.C. is Indiana Code section 26-1-1-201(37).

Courts and commentators alike have observed the difficult structure of prior U.C.C. § 1-201(37), which has separate subsections with the same identifying letters. See In re QDS Components, Inc., 292 B.R. 313, 331 n.8 (Bankr. S.D. Ohio 2002) (quotation omitted). Colorado's 2006 recodification was designed to and did eliminate this difficulty.

The bright-line test of § 1-203(b) has two prongs which, if both satisfied, dictate that a transaction creates a security interest. The first prong is satisfied "if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee." Colo. Rev. Stat. § 1-203(b). As one commentator has observed, this prong is satisfied if the lease "requires the lessee to make rental payments to the lessor 'come hell or high water.'" Dicker & Campo, supra, at 534 (footnote omitted).

The Defendants maintain that the Lease was subject to early termination by Vitco by virtue of Vitco being able to terminate the lease by exercising the EBO. But the Court of Appeals rejected this argument, pointing out that a termination clause differs from a buyout clause. Gibraltar, 925 N.E.2d at 755-56. We agree with the Court of Appeals and its analysis on this point – the consideration Vitco was obligated to pay was an obligation for the term of the lease and was not subject to termination by Vitco. Thus, the first prong of the bright-line test is satisfied.

The second prong of the bright-line test of § 1-203(b) is satisfied if any one of the four "Residual Value Factors" listed in § 1-203(b)(1) through (4) are found to exist. In re QDS Components, Inc., 292 B.R. 313, 332 & n. 9 (Bankr. S.D. Ohio 2002). Gibraltar acknowledges that the first three factors do not apply to the Lease. Appellant's Br. 18. But it contends that the fourth factor does, arguing that the Lease provided Vitco with "an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the [Lease]." Colo. Rev. Stat. § 4-1-203(b)(4). If so, both prongs of the bright-line test would be satisfied and the transaction would have created a security interest.

As discussed under Background, supra, the Lease gave Vitco two opportunities to become the owner of the punch press – at the end of the Lease and upon exercise of the EBO.

At the end of the Lease, Vitco had the right to purchase the press for its "fair market value"; no specific amount was provided. Did this provision give Vitco the right to buy the press "for no additional consideration or for nominal additional consideration"?

9

The statute provides that "[a]dditional consideration is not nominal if: . . . the price is stated to be the fair market value of the goods determined at the time the option is to be performed."[8] Colo. Rev. Stat. § 4-1-203(d)(2). The price "stated" for Vitco to purchase the press at the end of the lease was its "fair market value," in so many words, and so the consideration in this circumstance was not nominal. As such, the provisions of the end-of-term option did not cause the transaction to create a security interest.

The provisions of the EBO, however, were quite different. Under the EBO, Vitco had the right to buy the press after five years for the specific amount of $78,464.70. And as described in Background, supra, the Lease did declare that the parties agreed that this amount represented their best estimate of what the fair market value of the equipment would be on the EBO date. The Defendants argue that this language had the effect of "stat[ing]" that Vitco could purchase for fair market value within the meaning § 1-203(d)(2). For the same reason the provisions of the end-of-term option did not cause the transaction to create a security interest, the Defendants contend, so too for the EBO.

The Court of Appeals rejected this contention, holding that "the EBO applie[d] a fixed price [(the $78,000 amount)] to the value of the Punch Press rather than permitting the price to be determined at the time the option [was] to be performed." Gibraltar, 925 N.E.2d at 757. The Court of Appeals was correct in concluding that for § 1-203(d)(2) to operate, the fair market value of the goods must be determined at the time the option is to be performed. But, at the same time, § 1-203(e) directs that "'reasonably predictable' . . . fair market value . . . shall be determined with reference to the facts and circumstances at the time the transaction is entered into." Even if we were to conclude, reading these two provisions together, that fair market value could be specified in advance under the Fair Market Value Test, we think that for the Defendants to be entitled to summary judgment on this point, they were required to set forth material facts demonstrating that the $78,000 price constituted the expectations of Vitco and Finance at the time the transaction was entered into as to what the fair market value of the punch press would be on the EBO date.

---

[8] This test is referred to in the cases as the "Fair Market Value Test or Standard." See Gibraltar, 925 N.E.2d at 756 (quoting In re QDS Components, 292 B.R. at 335).

Except for the recitation in the contract itself, there was no evidence presented to the trial court of the expectations of Vitco and Finance at the time the transaction was entered into as to what the fair market value of the punch press would be on the EBO Date. There was evidence presented by Gibraltar's expert that the value of the press near the time of the EBO date was at least $100,000. Appellant's App. 229. And there was evidence that after Vitco's default, Finance sold the press for $160,000 approximately two-and-a-half years after the Lease was executed. Id. at 110. While these facts are not relevant to establishing the expectations of Vitco and Finance at the time the transaction was entered into, they are enough to keep us from crediting the contract recitation alone as reflecting the parties' actual expectations. We agree with the Court of Appeals that Finance failed to establish that the $78,000 EBO price is not nominal under the Fair Market Value Test.

While the Court of Appeals did not find § 1-203(d)(2) applicable here, it came to the ultimate conclusion that Vitco did not have an option to become the owner of the punch press for only nominal additional consideration upon compliance with the EBO Option. It reached this result by applying the test embodied in the first sentence of § 1-203(d) – referred to in the cases as the "Option Price/Performance Cost Test" – and concluding that the $78,000 price was greater than Vitco's reasonably predictable cost of performing if the EBO Option was not exercised. Gibraltar, 925 N.E.2d at 756-57 (citing In re QDS Components, 292 B.R. at 335). We agree. Had Vitco declined to exercise the EBO Option, it would have been required to pay an additional approximately $43,000 in rent. The only evidence in the record indicates that the cost to return the punch press would have equaled approximately $19,500, although that figure was not estimated at the time the parties entered into the agreement. Appellant's App. 228. In any event, the $78,000 price is not less than even the sum of these two amounts and, therefore, not nominal within the meaning of § 1-203(d). Gibraltar, 925 N.E.2d at 757; see also In re QDS Components, 292 B.R. at 335-340 (detailing the proper method of applying the "Option Price/Performance Cost Test" of § 1-203(d)).

To review, we have applied the objective, bright-line test of § 1-203(b) and concluded that the Lease did not create a security interest per se. Even though it was not subject to termina-

tion by Vitco, compliance with the Lease required Vitco to pay more than nominal consideration to become the owner of the press. This is because the $78,000 EBO price was not less than Vitco's reasonably predictable cost of performance under the Lease had the EBO not been exercised within the meaning of the Option Price/Performance Cost Test of § 1-203(d).

## III

### A

Under the objective, bright-line test of § 1-203(b), the Lease did not create a security interest per se. But because § 1-203(a) provides "[w]hether a transaction . . . creates a lease or security interest is determined by the facts of each case," the facts of this case may nevertheless dictate that the Lease did create a security interest. In re WorldCom, 339 B.R. at 70; Sankey v. ABCO Leasing, Inc. (In re Sankey), 307 B.R. 674, 680 (Bankr. D. Alaska 2004) (citing In re QDS Components, 292 B.R. at 333).

If a court finds that a transaction did not create a security interest per se, it must then "consider the economic reality of the transaction in order to determine . . . whether the transaction is more fairly characterized as a lease or a secured financing arrangement." Duke Energy Royal, LLC v. Pillowtex Corp. (In re Pillowtex), 349 F.3d 711, 719 (3d Cir. 2003). Unfortunately, the U.C.C. does not provide any explicit test or methodology for assessing the economic reality of the transaction. As a result, the cases contain a plethora of formulations and approaches which we will briefly survey.

The majority of courts and commentators recite that the principal inquiry in this regard is "'whether the lessor has retained a meaningful reversionary interest in the goods.'" In re WorldCom, 339 B.R. at 71 (emphasis in original) (citation omitted). However, again, the U.C.C. does not provide for assessing whether a lessor has retained a "meaningful reversionary interest." In re QDS Components, 292 B.R. at 341. Nevertheless, the WorldCom court explained the rationale for the "meaningful reversionary interest" test as follows:

> If the lessor does not possess a meaningful reversionary interest, the lessor has no interest in the economic value or remaining useful life of the goods, and therefore the lessor transferred title to the goods, in substance if not in form. In other words, the parties did not create a lease where the putative lessor does not have the interest, the entrepreneurial stake, in the goods that a true lessor would have.

339 B.R. at 72. But as the WorldCom court itself acknowledged, this reasoning by itself is "circular." Id. In point of fact, the absence of any accepted method of determining whether a meaningful reversionary interest exists renders such a determination more a statement of conclusion – that the transaction is a lease – than a method of analysis.

For its part, the Court of Appeals recognized that the cases provide no "'consistent set of factors for identifying a lessor's residual interest.'" Gibraltar, 925 N.E.2d at 758 (quoting In re Gateway Ethanol, L.L.C., 415 B.R. 486, 504 (Bankr. D. Kan. 2009)). Following the Gateway court, it "decline[d] to apply a laundry list of factors identified by other courts [and instead focused] on the economic factors of the Lease."[9] Id.

In sorting through these various formulations, we first conclude that the U.C.C. has rejected the laundry list approach in an apparent effort to "overrule a series of bad decisions under the pre-1987 version of section 1-201(37)." 4 White & Summers, supra, at 30. This was done because many of the factors considered under the old approach were just as applicable to true leases as they were to security interests. Kimco Leasing, 656 N.E.2d at 1218 n.15; In re QDS Components, 292 B.R. at 326.

Nonetheless, the U.C.C. does not explicitly prohibit consideration of these factors. Rather, it provides that "[a] transaction in the form of a lease does not create a security interest

---

[9] Similar to the Court of Appeals in this case, the Indiana Tax Court has rejected the "laundry list" approach and instead identified two considerations in determining whether the lessor retained a meaningful residual interest: "1) whether the lease contains an option to purchase for no or nominal consideration, and 2) whether the lessee develops equity in the leased property such that the only sensible decision economically for the lessee is to exercise the purchase option." Kimco Leasing, Inc. v. State Bd.of Tax Comm'rs, 656 N.E.2d 1208, 1218 & n.15 (Ind. Tax Ct. 1995); see also In re QDS Components, 292 B.R. at 342-43 (noting that California law considers similar factors). We note that the first consideration duplicates the second prong of the bright-line test contained in § 1-203(b)(4). See In re QDS Components, 292 B.R. at 343 n.20 (noting the redundancy in considering the nominality of the option price a second time in the meaningful-residual-interest analysis).

merely because" of the presence of any one or more of the six factors. Colo. Rev. Stat. § 1-203(c)(1)-(6) (emphasis added). Indeed, the Court of Appeals in Gangloff Industries, Inc. v. Generic Financing & Leasing, Corp. relied on this language in concluding that certain factors were not prohibited from consideration.[10] 907 N.E.2d at 1066 n.8; see also In re Worldcom, 339 B.R. at 71 (noting that the factors are "characterized as not sufficient alone to establish that a security interest has been created" (emphasis added)). Leading scholars, on the other hand, have opined that with the exception of the first,[11] the conditions are not only "not enough," but are simply not relevant in distinguishing between true leases and security interests. 4 White & Summers, supra, at 33.

**B**

To be entitled to summary judgment, the Defendants bear the burden of demonstrating the absence of any genuine issue of material fact as to whether the economic realities of the transaction dictate that it is a lease as a matter of law. Ind. Trial Rule 56(C). The Court of Appeals concluded that the Defendants were entitled to summary judgment because Finance had retained a meaningful reversionary interest in the punch press. This was so, according to the Court of Appeals, primarily because the equipment would still have had significant value had Vitco decided to return it at the end of the six-year Lease. It reached this conclusion because the useful life of the punch press was apparently fifteen to twenty years. Gibraltar, 925 N.E.2d at 758.

The putative lessor in the Pillowtex case made a similar argument. In that case, the Third Circuit found

---

[10] See also Margit Livingston, Bewitched, Bothered and Bewildered: The Courts and Revised Article 9 of the Uniform Commercial Code Ten Years Later, 9 DePaul Bus. & Com. L.J. 169 170-75 (2011) (discussing Gangloff in detail).

[11] The first condition considers the amount of rent the lessee is required to pay as compared to the fair market value of the goods at the time the lease is entered into. Colo. Rev. Stat. § 1-203(c)(1). We agree with these scholars that the exclusion of first condition is "puzzling" because "[n]ormally one would assume that when [the first condition] is met the parties have a secured sale, not a lease." 4 White & Summers, supra, at 30-31.

that under certain circumstances, the fact that transferred goods have a useful life extending beyond the term of the transferring agreement could reveal the transferor's expectation of retaining residual value in those goods. Such an inference would only be proper, however, where the evidence showed a plausible intent by the transferor to repossess the goods.

In re Pillowtex, 349 F.3d at 720. In Pillowtex, the court found no likelihood that the transferor would repossess the fixtures in question because their removal would have been prohibitively expensive. Id. at 720-21. That is certainly not the situation with the punch press. But Pillowtex's analysis does lead us to conclude that the punch press's useful life extending beyond the term of the Lease does not by itself establish that the transaction was a true lease.

## C

In the end, we "focus on economics." U.C.C. § 1-203 cmt. 2 (2001), 1 U.L.A. 29 (2004). This includes "all the economic factors which drove the transaction and which were the prime impetus to the ultimate decision to enter into the transaction and the reasons for structuring the transaction as it was done." Am. President Lines, Ltd. v. Lykes Bros. Steamship Co., Inc. (In re Lykes Bros. Steamship Co., Inc.), 196 B.R. 574, 580 (Bankr. M.D. Fla. 1996); see, e.g., United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609, 617 (7th Cir. 2005) (finding as determinative the measure for rent, the presence of a balloon payment, the effect of prepayment, and the lessee already having the asset and using it for an extension of credit); Kentuckiana Med. Ctr. LLC v. The Leasing Group Pool II, LLC (In re Kentuckiana Med. Ctr. LLC), No. 10-93039-BHL-112011, 2011 Bankr. LEXIS 1702, 2011 WL 1750769, at *7 (Bankr. S.D. Ind. May 6, 2011) (noting that the leases were structured in such a way as to make lessee's cost of returning the collateral exceed the cost of purchasing it); In re Grubbs Constr. Co., 319 B.R. 698, 720 (Bankr. M.D. Fla. 2005) (noting the key factor for entering into the transaction was the effective interest rate charged for financing); Gangloff Indus., 907 N.E.2d at 1065 (citing evidence that consideration was based on the price plus interest divided by months). Other factors may include, but are not limited to, the total amount of rent required of the lessee, whether the lessee acquired equity or any pecuniary interest in the goods, the useful life of the goods, the practical limitations on the lessee's ability to remove and return the leased goods, and the ability of the lessor to market the equipment. In re UNI Imaging Holdings, LLC, 423 B.R. 406, 418-20

(Bankr. N.D.N.Y. 2010) (citing In re Gateway Ethanol, 415 B.R. at 505); In re WorldCom, 339 B.R. at 74; In re Grubbs Constr. Co., 319 B.R. at 718-721.

At least some of these factors are present in this case. Pointing toward the transaction creating a security interest is the fact that Vitco already owned the punch press when it entered into the Lease with Finance (and it may have used it as security for an extension of credit). Pointing toward the transaction creating a lease are the useful life of the punch press, the absence of limitations on its removal, and the ability of Finance to market it.

What we are not able to determine, however, is whether the payment provisions of the Lease are more indicative of a lease or of a secured financing arrangement.[12] We know that the purchase price of the press at the time the transaction was $243,000. We know that Vitco had the option of purchasing it after five years for a total outlay of roughly $294,000 (60 monthly payments of $3,591.91 plus the EBO price of $78,464.70). And we know that if Vitco had not exercised the EBO, it would have been required to make twelve additional monthly payments totaling $43,102.92 (a total outlay of roughly $259,000), and thereafter it could have purchased the punch press for its then-appraised value.

The economics of the transaction can certainly be cast to demonstrate a lease: The parties agreed that Vitco would lease the punch press for 72 months at $3,592 per month with an option to buy at fair market value at the end. Under this approach, the EBO is an aside – an agreement as to the option price if Vitco wanted to exercise the option after 60 months.

On the other hand, the economics could also be cast to demonstrate a sale subject to a security interest: Vitco agreed to buy the punch press for $294,000 with 60 monthly payments of $3,592 plus a balloon payment of $78,000. Under this approach, the language regarding the sixth year was mere surplusage – paying the $78,000 was the only economically sensible course for Vitco to take.

---

[12] We note that the EBO appears to fall into the category of "purchase options whose fixed price is less than fair market value but greater than nominal that must be determined on the facts of each case to ascertain whether the transaction in which the option is included creates a lease or a security interest." U.C.C. § 1-203 cmt. 2 (2001), 1 U.L.A. 29 (2004).

A bankruptcy case discussed by both sides in their briefs illustrates this point. In that case, a construction company had entered into several equipment leases. In re Grubbs Constr. Co., 319 B.R. 698. Under the leases' early buyout options, the "price was determined in advance and in no way depended on a future valuation." Id. at 720-21. In holding that the equipment leases had created security interests, the court found that "the only economically sensible course for [the company], absent default, was to exercise the Early Buyout Option" and acquire the equipment. Id. at 721.

As the movants for summary judgment, the Defendants had the burden of establishing the absence of any genuine issue of material fact as to the economic realities of the transaction dictating that it was a lease as a matter of law. To do so required evidence of the expectations of Vitco and Finance at the time the transaction was entered into as to such factors as the value of the punch press on the EBO and lease expiration dates, the discount rate, and whether the "only economically sensible course" for Vitco would have been to exercise the EBO. We regret having to remand this case for further proceedings, but the authorities are clear that "[f]oresight not hindsight controls." 4 White & Summers, supra, at 33; see also In re UNI Imaging Holdings, 423 B.R. at 417 ("In determining whether 'additional consideration' is nominal, the Court is to examine the economic realities of the transaction and the expectations of the parties concerning the projected value of the equipment at the time they entered into the agreement . . . ." (citing In re Gateway Ethanol, 415 B.R. at 500)). We see no way of resolving this case without this evidence. Because such evidence was not presented, summary judgment was not appropriate.

## Conclusion

For the foregoing reasons, the judgment of the trial court is reversed and the case is remanded for proceedings consistent with this opinion.

Shepard, C.J., and Dickson, Rucker, and David, JJ., concur.